**CHICAGO TYPOGRAPHICAL UNION NO. 16, Plaintiff–Appellee,**

v.

**CHICAGO NEWSPAPER PUBLISHERS' ASSOCIATION, News Group Chicago, Inc., and Chicago Tribune Company, Defendants–Appellants.**

No. 87–1128.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 10, 1987.

Decided July 15, 1988.

Jeremy P. Sherman, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendants-appellants.

Gilbert A. Cornfield, Cornfield & Feldman, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, CUDAHY and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

The Chicago Newspaper Publishers' Association ("CNPA"), News Group Chicago, Inc., and the Chicago Tribune Co.,[1] appeal an adverse judgment ordering them to arbitrate certain contract disputes with the Chicago Typographical Union No. 16 (the "Union"). For the reasons which will appear, we affirm.

## I.

CNPA and the Union entered into a collective bargaining agreement (the "Main Agreement") that became effective on January 15, 1979, and was to expire on January 14, 1983. They were also parties to a Supplemental Agreement, negotiated and signed in 1975. One of the purposes of the Supplemental Agreement is to "provide employment guarantees and other benefits for journeymen and apprentices." Main Agreement at 61. (The Main Agreement is attached to the Union's Complaint as Appendix A.) The Supplemental Agreement is intended to be in force indefinitely and is incorporated into the Main Agreement and all future collective bargaining agreements through the following clause:

This Supplemental Agreement shall be ongoing and part of all future collective bargaining Agreements and shall not be subject to amendment except by mutual consent between the parties.

*Id.* at 82.

The Main Agreement contains a broad arbitration clause covering any "disagreement as to interpretation or enforcement of the terms of this Agreement." *Id.* at 28. The Supplemental Agreement contains arbitration provisions applicable to job security disputes which might arise as a result of a "severe economic downturn," *id.* at 64, but it contains no broad arbitration clause beyond that. The incorporation of the Supplemental Agreement into the Main Agreement, however, suggests that disputes involving the interpretation or enforcement of the Supplemental Agreement may be governed by the grievance and arbitration provisions of the Main Agreement.[2]

As the Main Agreement approached expiration, the parties began negotiating a new

1. This litigation arose from the much-publicized labor dispute between the Chicago Tribune and one of the unions representing its printers. The Chicago Tribune Co. and News Group Chicago, Inc., are members of the Chicago Newspaper Publishers' Association, which is party to the collective bargaining agreement with the Union. To simplify, we refer to all three appellants collectively as "CNPA."

2. Sections 23 through 29 of the Main Agreement, subtitled "Code of Procedure," describe the grievance procedures. Once a "disagreement" occurs, "the President of the aggrieved party shall address the President of the other party in writing, clearly setting forth the matters in question. An issue is then raised." Main Agreement at 28. If the Presidents, or their representatives, cannot resolve the issue within five days, it is referred to the Joint Standing Committee. The Joint Standing Committee is composed of three Union appointees and three employer appointees. The committee "may by unanimous consent choose an arbitrator ... to serve as impartial chairman when the committee is unable to agree in the determination of an issue." *Id.* at 28–29. The affirmative vote of at least four of the seven members is required to decide an issue. The contract provides that the committee's decision is final and binding on all parties.

Although the Supplemental Agreement does not expressly state that the Main Agreement's arbitration provision applies to it, CNPA apparently is willing to concede that it does. The Union noted that CNPA has "not challenged the application of the general arbitration clause of the main agreement to disputes over the interpretation and application of provisions of the Supplemental Agreement while the main agreement is in effect." Brief of Appellee at 9.

collective bargaining agreement. These negotiations extended beyond the January 14, 1983 deadline, but the Main Agreement continued in force. Section 9 of the Main Agreement specifically provides for the continuance in force of the existing terms and conditions of employment should negotiations for a new contract extend beyond the old contract's expiration date.[3] The Main Agreement further provides that its terms should remain in effect until a new agreement is negotiated or until "other action" is taken by either the Union or CNPA. Neither of these events terminating the old agreement had transpired before the occurrences giving rise to the present dispute. The Main Agreement also provides in a final clause of section 9 that, "Nothing herein shall be considered as obligating either party to arbitrate differences respecting an Agreement to be effective after the expiration of this contract." Main Agreement at 13.

In the fall of 1984, CNPA submitted to the Union its "final offer" for a new collective bargaining agreement. This offer included three proposals which, in the Union's view, violated certain specific guarantees of the Supplemental Agreement of 1975.[4] On January 8, 1985, the Union notified CNPA that it wanted the dispute resolved through the grievance and arbitration provisions of the still-effective Main Agreement. On January 15, 1985, CNPA, relying on the Main Agreement's "no obligation to arbitrate" clause (the final clause of section 9), responded that it would not submit the dispute to arbitration. It unilaterally instituted the proposed changes and by this "other action" terminated the extension of the Main Agreement.

The Union filed suit in district court seeking an order to compel arbitration of the dispute or, alternatively, resolution of the dispute by the court pursuant to its jurisdiction over collective bargaining agreements. The court, granting the Union's motion for partial summary judgment, ordered the parties to submit their dispute to arbitration.

## II.

CNPA argues that the district court misapplied the arbitration principles of *AT & T Technologies, Inc. v. Communication Workers of America*, 475 U.S. 643, 648–51, 106 S.Ct. 1415, 1418–20, 89 L.Ed.2d 648 (1986). In *AT & T*, the Supreme Court

---

**3.** Section 9 provides in full:

This Agreement shall continue in full force and effect for the period beginning with January 15, 1979, and continuing until January 15, 1983. Four months in advance of the expiration of this Agreement, either party may give the other party notice in writing of its intention to open negotiations for a new contract. A conference between the two contracting parties shall be held within ten (10) days from the date of such notice, and negotiations shall be of a continuous character (except through unavoidable delay) until finally concluded: Provided the party upon whom notice is served shall, within thirty (30) days after receipt thereof, present to the other party a counterproposal setting forth in detail the changes which it desires to negotiate. Should negotiations for a new Agreement extend beyond the expiration date of this Agreement, the wages, hours, terms and conditions of employment fixed by this Agreement shall remain in effect until a new enforcement is reached or until other action is authorized by the Union or by the Association. Nothing herein shall be considered as obligating either party to arbitrate differences respecting an Agreement to be effective after the expiration of this contract.

Main Agreement at 13.

**4.** One CNPA proposal would allow the employer to transfer composing-room employees to other departments. The Supplemental Agreement, according to the Union, forecloses this possibility by guaranteeing composing-room employees life-tenure in their jobs with the possibility that the employer could "buy out" the guarantee at a later date.

CNPA also proposes giving the foreman power to approve or disapprove the hiring of composing-room substitutes. The Union argues that this clause violates the transfer provision of the Supplemental Agreement, which purportedly guarantees the composing-room employees the right to engage a substitute without the foreman's approval.

Finally, CNPA proposes allowing the employer to assign certain display advertising work to other departments. The Union claims that the Supplemental Agreement permanently assigns such work to its members.

The Union argues that, under the terms of the Supplemental Agreement, CNPA is required to obtain the Union's consent before it may effectuate any of its three proposals.

reaffirmed four principles, established in the *Steelworkers Trilogy*, [5] to guide courts in determining whether a labor dispute is arbitrable. Under the first principle, the parties must have contracted to submit the grievance to arbitration before arbitration will be ordered. The second principle requires that the court determine whether the contract provides for arbitration of the particular grievance in question. The third principle demands that, while determining whether the dispute is arbitrable, the court not decide the merits of the grievance. Thus, even if the union's grievance appears to be frivolous, the issue whether the employer has violated the collective bargaining agreement must be referred to the arbitrator. Finally, if the contract contains an arbitration clause, a presumption of arbitrability arises. The court should not decline to order arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 650, 106 S.Ct. at 1419 (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1986)).

CNPA urges that the fourth principle was misapplied by the district court because arbitration of the present dispute is precluded by the final clause of section 9 of the Main Agreement, *supra* p. 508, which excuses the parties from submitting new contract terms to arbitration. Thus, CNPA insists that section 9 contains an express agreement by the Union to exclude the particular grievances at issue here from arbitration.

The district court rejected CNPA's argument, holding that section 9 applies only to disputes involving *future agreements*, not to disputes involving *proposals* for future agreements. CNPA contends that the district court's construction of section 9 renders the exclusionary language superfluous. According to CNPA, the final clause of section 9 has meaning only if interpreted as expressing the parties' intent to reach new contract terms through negotiation rather than through arbitration. Thus, CNPA argues persuasively that the clause precludes "interest arbitration" [6] and that the district court's order forces CNPA to submit to interest arbitration in violation of the clause.

■ We agree with CNPA that the last clause of section 9, which expressly frees both sides from arbitrating disputes over "an Agreement to be effective after the expiration of [the Main Agreement]," Main Agreement at 13, precludes interest arbitration. Section 9 describes the procedure for negotiating a new collective bargaining contract and expresses the parties' intention to negotiate, rather than to arbitrate, the terms of this new contract. *See supra* note 3. Thus, the final clause, precluding interest arbitration, is consistent with and furthers the overall purpose of section 9.[7]

5. The *Steelworkers Trilogy* comprises three United States Supreme Court cases. *See United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

6. "Interest arbitration" in labor matters involves the submission of disputes over terms for a new collective bargaining contract to an independent third party who determines what the *new* terms of the contract will be. Interest arbitration should be distinguished from "grievance arbitration," which involves the submission of disputed interpretations of an existing collective bargaining agreement to an independent third party who determines what construction the existing term should be given. *See* Morris, *The Role of*

*Interest Arbitration in a Collective Bargaining System*, 1 Indus.Rel.L.J. 427, 428 (1976). Interest arbitration provisions were common in the newspaper printing industry until the late 1970s. *Id.* at 497; *see also NLRB v. Columbus Printing Pressmen & Assistants' Union No. 252*, 543 F.2d 1161, 1163 (5th Cir.1976).

7. Although we do not agree with the district court's interpretation of section 9, we are not necessarily required to reverse its grant of partial summary judgment. "It is well established that a grant of summary judgment may stand if a reviewing court finds any sufficient basis for the judgment in the record." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 359 (7th Cir.) (citing *Helvering v. Gowran*, 302 U.S. 238, 245–46, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937)), *appeal dismissed, cert. denied*, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983).

We must decide, therefore, whether the Union is seeking interest arbitration. CNPA argues that it is, characterizing the Union's grievance as one over the appropriate terms of a new collective bargaining agreement. The Union contends, however, that it seeks arbitration of the question whether specific guarantees that it won in the Supplemental Agreement of 1975 have been violated by CNPA.

■ Carefully avoiding a ruling on the merits of the Union's claim, we agree with the Union that the dispute is not simply over the parties' proposals for a new collective bargaining agreement. Rather, the Union is seeking to protect the existing rights of certain employees under the Supplemental Agreement of 1975. In the Union's view, CNPA sought to change those rights without the Union's consent and, thus, violated the express terms of the Supplemental Agreement. When the Union filed its grievance on January 8, 1985, both the Supplemental and the Main Agreements were in full force.[8] The Union correctly followed the Main Agreement's grievance and arbitration procedures, which the parties had created to resolve "difference[s] as to the interpretation or enforcement" of the existing agreement. Main Agreement at 28. Thus, because the present dispute involves the parties' rights under an existing collective bargaining agreement that contains a broad arbitration clause, we conclude that the dispute is arbitrable.

The outcome of this case turns on the continuance in force of the obligations of the Supplemental Agreement. The parties agreed to incorporate the lifetime job guarantees found in the Supplemental Agreement into all their future collective bargaining agreements. Hence, disputes over interpretation or enforcement of these rights are susceptible to grievance arbitration. Had guarantees instead been limited to the life of the Main Agreement, a proposal to alter these guarantees in a new collective bargaining agreement would likely fall under the rubric of interest arbitra-

tion. But these are not the circumstances before us. The contractual guarantees in the Supplemental Agreement are of a continuing nature and are supported by an underlying collective bargaining agreement. Essentially, the Union sought to arbitrate disputes involving the interpretation or enforcement of those guarantees. Thus, the district court's order that the dispute be arbitrated is

AFFIRMED.

---

8. We therefore need not address whether the rights guaranteed in the Supplemental Agreement could be enforced without a valid Main Agreement underlying it.