**Sherry EIRHART, Plaintiff,**

**v.**

**LIBBEY–OWENS–FORD COMPANY, Defendant.**

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

**v.**

**LIBBEY–OWENS–FORD COMPANY, Defendant.**

**Nos. 76 C 3182, 78 C 2042.**

United States District Court, N.D. Illinois, E.D.

July 29, 1988.

Thomas R. Meites, Lynn Sara Frackman, Meites, Frackman & Molder, Chicago, Ill., for Eirhart.

Robert S. Soderstrom, Daniel R. Formeller, Jacqueline A. Criswell, Tressler, Soderstrom, Maloney & Priess, Chicago, Ill., for Libbey–Owens–Ford Co.

John Rowe, Margaret L. Herbert, John Hendrickson, E.E.O.C., Chicago, Ill., for plaintiff E.E.O.C.

R. Michael La Belle, Thomas P. Powers, Powers & Lewis, Washington, D.C., Seymour Schriar, Chicago, Ill., for intervening Unions.

## MEMORANDUM OPINION

SHADUR, District Judge.

After many years of vigorously contested litigation, followed by nearly three years of equally vigorously contested negotiations, plaintiffs [1] and defendants Libbey–Owens–Ford Company and LOF Glass Inc. (collectively "LOF") arrived last fall at a settlement agreement (the "Settlement Agreement") to resolve plaintiffs' claim that LOF's minimum height-and-weight requirements for the hiring of hourly employees discriminated against females. All terms of the parties' settlement, well summarized at pages 2 through 6 of plaintiffs' March 4, 1988 memorandum (a copy of that summary is attached as Appendix A to this opinion), were embodied in a proposed Consent Decree.

This Court initially found that the proposed Consent Decree fell within the required range of "fair, reasonable and adequate" provisions—sufficiently so to call for the sending of extensive notices of a fairness hearing to the plaintiff class members and, as provided by Settlement Agreement ¶ III.5.A.(i) and ¶ III.6, to the unions representing LOF's employees and to LOF's incumbent employees themselves. That fairness hearing (the "Hearing") was held as scheduled March 15, 1988. Neither before, at nor since the Hearing has any class member objected to the fairness, reasonableness or adequacy of the proposed Consent Decree. Rather the only such objections have come solely from Aluminum, Brick and Glass Workers International Union, AFL–CIO and its local unions (collectively "Union," treated for convenience as a singular noun), all of which have been given leave to intervene here, and from a

---

1. Plaintiffs comprise (1) a class of women represented by Sherry Eirhart and (2) a governmental agency, Equal Employment Opportunity Commission ("EEOC"). Separate counsel have ably represented the class and EEOC throughout the litigation.

number of Union's members.[2]

This Court has temporarily deferred its ruling on approval or disapproval of the Consent Decree pending Union's efforts to seek relief from the National Labor Relations Board ("Board") against LOF's asserted unfair labor practice in having entered into the Settlement Agreement without negotiating on the subject with Union. At this point the matter remains before Board, which is reviewing its Regional Counsel's decision that declined to issue a complaint against LOF. However, the parties have just advised this Court that it is now in receipt of all the submissions it can anticipate getting on the merits, so the matter of the Consent Decree is ripe for determination.

■ This Court has considered Union's objections in detail, having reviewed in that connection the lengthy memoranda submitted by Union and plaintiffs (LOF has not tendered any memorandum on the subject) plus all the cases each of the disputants has cited in support of its or their position. That review discloses that a number of Union's objections are a product of its not understanding just how the Consent Decree will work. As for the remaining objections, which are largely but not exclusively addressed to seniority considerations, this Court finds all of them are without merit, and it has therefore signed the Consent Decree today. This memorandum opinion is intended to provide a supplemental statement of reasons for having done so.

In that respect, this Court finds itself in agreement with the legal analysis contained in plaintiffs' excellent memorandum filed March 4, 1988, as supplemented by plaintiffs' March 23 filing of supplemental affidavits and an accompanying statement. No extended treatment of the issues is therefore called for to recapitulate that analysis. Instead a few important highlights will be dealt with.[3]

Most importantly, approval of the Consent Decree is in full accord with the teachings of controlling case law, including *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) (the case on which Union places its principal, though not sole, reliance). Union's argument that there has been no finding of LOF's discriminatory practices must be viewed as somewhat myopic under the facts here.

These actions first came to this Court's calendar in 1980 upon remand from the Court of Appeals, which had reversed a summary judgment granted in LOF's favor by another District Judge (see the Court of Appeals opinion at 616 F.2d 278 (7th Cir. 1980)). Had LOF's height-and-weight rule been clearly insulated from legal attack as sex-discriminatory, that of course would have been an independent basis for *affirmance* of the summary judgment, even though the Court of Appeals disagreed with the ground on which the District Judge had relied in reaching his conclusion.[4] At least inferentially, then, the

---

2. Only Union has filed legal memoranda and supporting documents. As for its members who have filed objections, most are LOF people from its Ottawa, Illinois plant (primarily on layoff status, but including some few incumbent employees). All the individual objectors have addressed their comments to the Consent Decree's seniority provisions that form the principal focus of Union's submission as well:

    1. One brief petition is signed by 75 individuals from the Ottawa area (nearly ten of those people also submitted individual letters).

    2. Another 14 individuals from the Ottawa area also submitted individual letters.

    3. Five letters were received from people in the area of LOF's Toledo, Ohio plant.

All the individual submissions express concern that the Consent Decree's seniority provisions

will have an adverse impact on their own prospects of being called back to work.

3. No negative inference should be drawn from this memorandum's failure to address any particular issue in detail. Indeed the situation is the converse: Whenever a subject is *not* discussed at length here, that is because (1) it is fully dealt with in plaintiffs' memorandum, (2) this Court agrees fully with the analysis there and (3) it would be an act of supererogation if this opinion were simply to repeat or to paraphrase the treatment in that memorandum.

4. It is of course hornbook law that an appellate court may affirm on *any* ground, even though different from that forming the basis for the lower court's decision, while it may reverse only on grounds raised by the appellant. Just during

Court of Appeals' action in reversing and remanding confirmed the viability of plaintiffs' sex-discrimination claim on at least a prima facie basis. In light of the record evidence as to the disparate impact of the rule on women, this Court had little difficulty a few years later in finding, as part of a partial grant of preliminary injunctive relief (July 26, 1983 order):

> Plaintiffs have a more than a reasonable likelihood of success on the merits of this action. See the earlier opinion by our Court of Appeals reversing summary judgment in LOF's favor, 616 F.2d 278 (7th Cir.1980).

More significantly, in real-world terms it is a substantial understatement to speak of the height-and-weight rule as though it were just "prima facie" discriminatory. As stated at the outset of this opinion, LOF has fought this litigation long and hard (and at what is obviously a great deal of expense). This case must be contrasted sharply with the situation described in *In re Birmingham Reverse Discrimination Employment Litigation,* 833 F.2d 1492, 1499 (11th Cir.1987), *cert. granted sub nom. Martin v. Wilks,* — U.S. ——, 108 S.Ct. 2843, 101 L.Ed.2d 881 (1988), in which the individual plaintiffs there correspond to Union and its complaining members here, and the City there corresponds to LOF here:

> Of course, the City did consent to the decrees, and one might argue that the individual plaintiffs as City employees shared an identity of interest with the City such that they are now bound. However, the record fails to indicate that the City mounted a vigorous defense to the allegations leveled against it before entering into settlement negotiations. Indeed, the district court never tried the independent claims against the City. Consequently, it is far from clear that the City in any way adequately represented the individual plaintiffs' interests

in the events leading up to the entry of the decrees.

Though Union now urges LOF has had no stake in exactly which individuals it hired, and hence has had no stake in the height-and-weight rule attacked by plaintiffs in this action, the best disproof of that theoretical proposition is the protracted battle that LOF waged in defense of the rule (obviously reflecting its perception, whether justified or misguided, that the rule served its own interest). And it was only after that extended fight that LOF has entered into a settlement under which (1) the height-and-weight rule will be abolished and (2) no other rule can be put in its place without an extensive procedure for verifying its non-sex-discriminatory nature. It is more than fair to infer that such surrender would not have taken place without LOF's recognition of the substantial likelihood that the test would be held tainted, even though LOF (ever the properly careful litigant) has not admitted as much in the Settlement Agreement or Consent Decree and even though this Court has not made any determination in that respect (see Consent Decree ¶ V.1).

Under those circumstances, it makes no sense at all to accept Union's position that the absence of a formal determination of discrimination after an evidentiary hearing (or the absence of a specific mea culpa statement by LOF without a hearing) somehow precludes this Court from approving the Consent Decree. There is more than ample demonstration here to support such approval, not only from the plainly established disparate impact of the height-and-weight rule on females but also from the other circumstantial confirmation just outlined.

Indeed, Union's argument really proves too much. To require a formal adjudication of liability as a precondition to a valid consent decree would undercut the principles of encouraging settlement of litigation that give sanction to consent decrees in the

---

the current month, for example, our Court of Appeals has issued at least two opinions in which it disagreed in whole or substantial part with the district court's analysis but still affirmed on grounds other than those on which

the district court had acted (see, e.g., *Wojan v. General Motors Corp.,* 851 F.2d 969 (7th Cir. 1988) and *Chicago Typographical Union No. 16 v. Chicago Newspaper Publishers Ass'n,* 853 F.2d 506 (7th Cir.1988)).

first place. *Stotts* does not require what Union contends for.[5] What *Stotts* rather insists on is the same thing the Supreme Court had previously articulated in *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) and *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). As *Stotts*, 467 U.S. at 578–79, 104 S.Ct. at 2587–88 put it:

> If individual members of a plaintiff class demonstrate that they have been actual victims of the discriminatory practice, they may be awarded competitive seniority and given their rightful place on the seniority roster. This much is clear from *Franks v. Bowman Transportation Co.*, 421 U.S. 747 [96 S.Ct. 1251, 47 L.Ed.2d 444] (1976), and *Teamsters v. United States, supra. Teamsters*, however, also made clear that mere membership in the disadvantaged class is insufficient to warrant a seniority award; each individual must prove that the discriminatory practice had an impact on him. 431 U.S., at 367–71 [97 S.Ct. at 1870–73]. Even when an individual shows that the discriminatory practice has had an impact on him, he is not automatically entitled to have a nonminority employee laid off to make room for him. He may have to wait until a vacancy occurs, and if there are nonminority employees on layoff, the court must balance the equities in determining who is entitled to the job.

Here the height-and-weight rule has been demonstrated to have the sharply disparate impact on females that establishes more than a prima facie case of discrimination—there is no need to show LOF's discriminatory *intent* to support relief, as in a disparate treatment case. And as already indicated, LOF can reasonably have opted for a negotiated settlement rather than being forced to the bitter-end litigation of a trial that would confirm that the more than prima facie case translates into an ultimate holding of discrimination in fact. As *Stotts* and the other cases it cites require, the Consent Decree specifically limits relief to plaintiffs who prove that they are identified victims of that discriminatory height-and-weight rule. Because that is so, those plaintiffs enjoy a "presumption in favor of rightful-place seniority relief" (*Franks*, 424 U.S. at 779 n. 41, 96 S.Ct. at 1271 n. 41).

It must also be emphasized that the Consent Decree does not displace LOF's present active employees in favor of class members, and in seniority terms it places each class member on the ladder at precisely the same place she proves she would have occupied but for the height-and-weight rule. Indeed, the short answer to Union's argument (and that of the objecting individuals now on layoff status) is that the victims of LOF's sex-discriminatory rule *deserve* to be put into their respective positions of priority vis-a-vis the previously employed but now laid-off employees.

It is additionally important to evaluate the practical, rather than theoretical, effect of the Consent Decree's seniority requirement (*Franks, id.* requires parties in Union's position to demonstrate an "unusual adverse impact arising from facts and circumstances that would not be generally found in Title VII cases," and not merely to show the "abstract basis of adverse impact upon interests of other employees"). Plaintiffs' Mem. 11–26 deals with that practical impact in great detail and wholly persuasively, demonstrating there is no "unusual adverse impact" on LOF's other incumbent or laid-off employees. Though to be sure Union can point to individual instances of hypothetical (or even real) hardship if future LOF hiring or rehiring develops in certain theoretical ways, that potential does not undercut the overall fairness of the carefully-crafted plan set out in the Consent Decree. Once again, anyone who

---

**5.** In fact, *Local 28, Sheet Metal Workers' International Ass'n v. EEOC,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) suggests that a broad literal reading of *Stotts* in the manner urged by Union is at least suspect, for *Sheet Metal Workers* upheld a racially-oriented minority employment goal (even though it looked much like a quota) where it did not cause incumbent majority employees to lose their jobs. See the discussion in Rutherglen, *Major Issues in the Federal Law of Employment Discrimination* 28–30 (2d ed. 1987), issued by the Federal Judicial Center.

is disadvantaged will by definition suffer that result only in comparison with a class member who has a higher call on the equitable considerations any court (including this one) must consider in exercising its equity powers.

Next, Union's grab-bag of complaints other than the seniority issue are adequately dealt with at Plaintiffs' Mem. 28–31 and 34–35 and in plaintiffs' supplemental affidavits and accompanying statement filed March 23. None merits further discussion beyond a reference to plaintiffs' analysis in those papers.

■ Finally, Union's objection that its own noninvolvement in the settlement negotiations dooms the Consent Decree (based on the concurrence of a single Justice, Justice O'Connor, in *Stotts*) is without merit. Even Justice O'Connor's position does not demand union participation where the consent decree provides relief—as it does here—to identified victims of discrimination (see 467 U.S. at 587–89, 104 S.Ct. at 2592–94). And post-*Stotts* a six-Justice majority of the Supreme Court (in an opinion in which Justice O'Connor joined) has spoken more directly to the issue in *Local Number 93, International Association of Firefighters, AFL–CIO v. City of Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 3079, 92 L.Ed.2d 405 (1986) (citations omitted):

> Local 93 and the Solicitor General also challenge the validity of the consent decree on the ground that it was entered without the consent of the Union. They take the position that because the Union was permitted to intervene as of right, its consent was required before the court

could approve a consent decree. This argument misconceives the Union's rights in the litigation.

> A consent decree is primarily a means by which parties settle their disputes without having to bear the financial and other costs of litigating. It has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation. Thus, while an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent.... Here, Local 93 took full advantage of its opportunity to participate in the District Court's hearings on the consent decree. It was permitted to air its objections to the reasonableness of the decree and to introduce relevant evidence; the District Court carefully considered these objections and explained why it was rejecting them. Accordingly, "the District Court gave the union all the process that [it] was due...."

That reasoning and holding could not be more directly on point for this case.

In summary, Union's objections do not, either singly or in the aggregate, derogate from the conclusion that the Consent Decree is indeed fair, reasonable and adequate. This Court has therefore determined the Consent Decree should be approved and has done so contemporaneously with the issuance of this memorandum opinion.[6]

6. Brief mention should be made of the only other current filings in these cases, none of which affects this Court's decision to approve the Consent Decree:

1. As stated earlier in this opinion, Union continues its efforts before Board to charge LOF with an unfair labor practice in its having negotiated and entered into the Settlement Agreement. In this lawsuit affidavits have been submitted by an LOF executive and by Union's General Counsel as to when Union was first apprised of the potential settlement. This Court is not called upon to treat with, let alone resolve, that question for current purposes.

2. LOF and plaintiffs have just this week raised a question as to the manner in which certain provisions of the Consent Decree bear on the required timing for plaintiffs' review of and objections to a new hiring test now proposed by LOF. This Court has established a short timetable for further briefing by the parties, but once against there is no occasion to defer approval of the Consent Decree on that account (indeed, quite the contrary is true).

3. Less than two weeks ago EEOC filed its petition for an award of costs. On that subject the filing of any LOF objections, to be

## APPENDIX A

### I. *The Settlement Agreement*

In this Title VII suit, plaintiffs Eirhart and the EEOC alleged that the minimum height and weight requirement defendants Libbey–Owens–Ford Company and LOF Glass Inc. ("LOF") used in hiring hourly employees discriminated against females. After almost three years of settlement negotiations, the parties finally reached an agreement designed to prevent the future use of discriminatory hiring criteria, provide backpay and job relief to class members, and minimize any impact of the settlement on the existing LOF workforce. The job relief aspects of the decree, including seniority, pension benefits, and educational programs, were intended to put class members in the position they would have been in had they been hired when they initially applied.

Under the terms of the decree, LOF must drop its minimum height and weight hiring criteria and may not adopt in their stead any unvalidated preemployment physical requirement that has a disparate impact on women. (Consent Decree, Art. VI). Before LOF may use a physical hiring requirement with a disparate impact on women in the future, it must first establish to plaintiffs' satisfaction that the requirement has been validated in conformity with the law. (Consent Decree, Art. VI, § 5). If plaintiffs are dissatisfied with the validation, the parties must try to conciliate the matter and then may obtain a judicial determination of the validity of the requirement. (Consent Decree, Art. VI, § 5(g), (h)). Should such a judicial determination be delayed for reasons not attributable to LOF beyond certain specified deadlines, LOF may use the proposed procedure at its own risk. (Consent Decree, Art. VI, § 5(q)). If the requirement is not ultimately approved, class members who were denied employment or delayed in obtaining employment as a result of the requirement have access to remedial procedures. (*Id.*)

In addition to abrogating its present height and weight requirements, LOF must hire 342 class members who otherwise qualify for employment as openings arise at LOF plants.[2] (Consent Decree, Art. VII). A class member interested in obtaining employment at LOF (a "JSCM") will be placed on either the "Hire List" or the "Transfer Hire List" at each covered and presently operating LOF glass plant she designates on her completed claim form.[3] (Consent Decree, Art. VII, § 5(A), (C)). Each JSCM on either a hire or transfer list will be assigned a "listing date" based on the date of the next available opening at her home plant following the date she originally applied or was deterred from applying at that plant. (Consent Decree, Art. VII, § 5(C)).

Once a JSCM has risen to being ranked first on a given plant's Hire List, she will be offered the next available opening so long as her listing date is earlier than the Plant Seniority Service Date of any laid off LOF employee at that plant.[4] (Consent

followed by this Court's ruling on the matter, will ensue in the ordinary course.

2. As explained in the attached affidavit of T.R. Meites, one of the attorneys for the plaintiff class, the 342 job openings reserved to the plaintiff class represent the actual shortfall of female hires at the respective LOF plants attributable to the minimum height and weight rule. (Meites Aff., Attachment 1 at ¶ 11). Thus, the 342 openings reflect jobs which, had there been no height or weight minimum, would have gone to members of the plaintiff class. Because the openings are specific to the pool of JSCMs who applied or would have applied at each particular plant, LOF's hiring obligations are satisfied when the number of jobs specified for each plant are filled. (Consent Decree, Art. VII, § 5(F)). For example, under the proposed decree there are 17 positions for members who establish they applied or would have applied at the Lathrop facility. Once 17 JSCMs from the Lathrop pool obtain employment under the decree (at either Lathrop or any other plant they have designated), the other members of the Lathrop group are no longer eligible for consideration and are removed from the hire and transfer lists. (*Id.*)

3. A JSCM will be placed on the Hire List for each plant to which she originally applied (her "home plant") and on the Transfer Hire List for any other plant she designates as acceptable. (Consent Decree, Art. VII, § 5(C)).

4. The same system governs JSCMs on Transfer Hire Lists, who are eligible for openings when the Hire List is exhausted. (Consent Decree, Art. VII, § 5(E)).

Decree, Art. VII, § 5(E)). The JSCM must accept the offer within the deadlines specified in the decree or lose her right to employment. (Consent Decree, Art. VII, § 5(H), (I)). If the JSCM accepts the job offer, she must qualify for employment under the then existing eligibility standards and complete a 60–day probationary period. (Consent Decree, Art. VII, §§ 7, 8). Upon completion of the probationary period, the JSCM will be credited for purposes of determining initial plant placement with a Company Seniority Service Date identical to her listing date. (Consent Decree, Art. VII, § 8). For purposes of bidding, assignment, lay off and recall rights, however, the JSCM must look to her Plant Seniority Service Date, which begins on her first day of actual employment as a probationary employee and, if she has taken a position at a home plant (but not a transfer plant), accrues at the rate of two years credit for every year worked until her company and plant seniority are the same.[5] (*Id.*)

On hire, the JSCM will be given information regarding the types of jobs at the plant, a list of seniority departments, the jobs, wages and employees (by seniority) in those departments, and, upon request, any other relevant information concerning entry level job requirements, performance and compensation. (Consent Decree, Art. VIII). A JSCM becomes eligible for pension relief on her first day of work and begins participation in the LOF Glass pension plan. (Consent Decree, Art. VII, § 10). Once she has worked for three years, the JSCM will be credited for pension benefit purposes with the time since she would initially have been hired (i.e., since her listing date). (*Id.*)

Finally, LOF will pay at least $7.3 million to the class in settlement of backpay claims, as well as reasonable attorneys' fees to the class attorneys and plaintiffs' litigation costs and expenses. (Consent Decree, Arts. X, XII).

---

5. Plant seniority at a transfer plant accrues at the rate of one year of credit for each year worked. (Consent Decree, Art. VII, § 8).

## SUPPLEMENT TO MEMORANDUM OPINION

After the accompanying Memorandum Opinion (the "Opinion") had been prepared, and after the Opinion and the Consent Decree had been signed by this Court—indeed, just as distribution of the executed Opinion and Consent Decree was being arranged for by this Court's law clerk—a letter was delivered to chambers by messenger from counsel for LOF, enclosing:

1. a July 28, 1988 letter from counsel for Union to Board's field attorney; and

2. a July 11, 1988 letter from that field attorney to Union's counsel, to which the July 28 letter was a response.

That was this Court's first inkling that LOF (and apparently Union) viewed LOF's Motion for Interpretation of the Settlement Agreement and Proposed Consent Decree, filed in early March 1988 (just before the fairness hearing on the Consent Decree), as still outstanding and undecided. As Opinion at 876 n. 6 reflects, that motion was not one of the matters this Court perceived as being among the "only other current filings in these cases."

It has always been this Court's view that it was not really appropriate for it to "advise" LOF as to what it should do as a litigant before Board or in any forum except this one.[1] Because LOF's motion concluded with a prayer "that the fairness hearing, presently scheduled for March 15, 1988 not proceed until such time as this Court issues such Interpretations," and because this Court in fact then proceeded with the fairness hearing, this Court simply assumed the request was necessarily understood as one this Court was not prepared to grant. One thing this Court certainly believed it had made clear is that it was not about to encroach on Board's province in dealing what the law places exclusively there: the determination of whether the National Labor Relations Act has or has not been violated. But in any case, to the extent there has been any failure of

---

1. In *this* litigation, of course, any such "advice" (if it may be so characterized) necessarily takes the form of this Court's orders on issues tendered in the course of the litigation.

communication on either score referred to in this paragraph, this Court is quite willing to accept responsibility.

At this point the Consent Decree has been approved. No "Interpretation of the propriety of the preferential hiring and seniority relief of the Settlement Agreement and proposed Consent Decree," beyond what is implicit in such approval, is appropriate. Nor is it appropriate to advise LOF as to what it should or should not do before Board as to Union's efforts to obtain an unfair labor practice charge or, if one is obtained, what LOF should do in defending against it. To the extent LOF's motion is perceived as asking for more than this Court's approval of the Consent Decree, it is denied.