

Gilbert A. Cornfield, Cornfield & Feldman, Chicago, Ill., for plaintiff.

Jonathan Vegosen, Damon E. Dunn, Ellen B. Epstein, Levin & Funkhouser, Ltd., Chicago, Ill., Thomas M. Seger, Elliott S. Azoff, David G. Holcombe, Baker & Hostetler, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

**CHICAGO TYPOGRAPHICAL UNION NO. 16, Plaintiff,**

v.

**CHICAGO SUN–TIMES, INC., Defendant.**

**No. 90 C 2037.**

United States District Court, N.D. Illinois, E.D.

Sept. 10, 1990.

The Chicago Typographical Union No. 16 ("Union") filed this action against the Chicago Sun–Times, Inc. ("Sun–Times") to compel arbitration of certain aspects of the Sun–Times' "final offer" for a new collective bargaining agreement. Both parties now move for summary judgment. For the reasons set forth below, the Union's motion is denied, and the Sun–Times' motion is granted.

## FACTUAL BACKGROUND

The Union and the Sun–Times are currently bound by the provisions of an existing collective bargaining agreement (the "Main Agreement"). Although originally scheduled to expire on January 14, 1989, the parties agreed in early January 1989 to extend the terms of the Main Agreement indefinitely, subject to cancellation by either side upon forty-eight hours notice. No such cancellation notice has thus far been given.

Any "disagreement" relating to the "interpretation or enforcement of the terms of th[e Main] Agreement" is remedied by utilizing the steps set forth in the "Code of

---

Procedures" section of the Main Agreement. Main Agreement §§ 23–29, at 27–29 (Union's complaint, appendix A).[1]

The parties are also bound by the terms of a Supplemental Agreement, executed in 1975. The terms of the Supplemental Agreement are incorporated into the Main Agreement; indeed, those terms are to be incorporated into all future collective bargaining agreements as well. Main Agreement at 89.

The Main Agreement represents the first (and as yet only) collective bargaining agreement negotiated and finalized by the Union and the Sun–Times. Formerly, the Union dealt with the Chicago Newspaper Publishers' Association (CNPA), which represented both the Sun–Times and the Chicago Tribune ("Tribune"), the larger of Chicago's two major newspapers. Separate negotiations began in 1985, one result of a Union strike that year against the Tribune.

The Main Agreement contains what is commonly referred to as a "most favored nations" clause.[2] Essentially, this provision enables the Sun–Times to reap the benefits of whatever concessions its larger competitor, the Tribune, can get from the Union during the course of its own separate negotiations.

The present litigation arises, at least in part, out of the Sun–Times' reaction to one such Union–Tribune negotiation. The Union and the Tribune entered into a collective bargaining agreement on January 3, 1989, nearly three years after the Union went back to work at the Tribune following its strike. The Sun–Times reviewed that agreement and an accompanying modified agreement for consent decree and identified several significant concessions it believed had been won by the Tribune. At the newspaper's request, Union representatives met informally with Sun–Times officials to determine what course of action the Sun–Times might take in light of those perceived concessions.

Unable to reach a consensus with Union representatives, the Sun–Times went ahead and, pursuant to the most favored nations clause, implemented certain changes regarding wages, hours, and working conditions on July 9, 1989. These changes included limiting the Union's work jurisdiction to manual paste make-up work, instituting a management rights clause which encompassed the right to transfer employees, and eliminating the right of an employee to hire a substitute without the supervisor's prior consent.

The Union contested the Sun–Times' actions and demanded arbitration as to whether the Main and Supplemental Agreements had been violated. The dispute went before Arbitrator Dr. Fred Witney on Au-

---

**1.** The grievance procedure has been described elsewhere. See *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.,* 860 F.2d 1420, 1421 n. 2 (7th Cir.1988). Briefly, that procedure entails that once a disagreement as to the interpretation or enforcement of the terms of the Main Agreement occurs, the President of the aggrieved party shall formally raise the issue with the President of the other party. Main Agreement at 27. A "Joint Standing Committee" addresses the issue if it cannot be resolved by the Presidents. That Committee, composed of three representatives from each side, may, by unanimous consent, appoint an arbitrator. Resolution of the issue then requires the affirmative vote of at least four of the seven Committee members. The Committee's decision is final and binding on both parties. *Id.* at 27–29.

**2.** In its entirety, the "Uniformity of Agreement" clause provides that:

If any terms regarding wages, hours or working conditions that affect the cost of operations in the Composing Room ... are granted to the Chicago Tribune during the life of this Agreement which are better or different and have the effect of reducing operating costs in the Composing Room, the Parties shall meet to review such terms or concessions within five (5) days after such term or concession has been granted. Within ten (10) days after such meeting, the [Sun–Times] shall decide whether it wishes to implement such better or different terms or concessions or effectuate some other change affecting the cost of operation in the Composing Room. If the [Sun–Times] wishes to implement some other change, the Parties shall meet ... to determine whether agreement can be reached to implement such other change. If no agreement is reached within fifteen (15) days from the date the Parties meet to discuss implementing such other change, the [Sun–Times] may elect to implement such better or different terms or concessions granted to the Chicago Tribune forthwith.

Main Agreement § 7(a), at 11–12.

gust 11–12, 1989. Arbitrator Witney found that certain wage reductions instituted by the Sun–Times went beyond the scope of the most favored nations clause and were impermissible. He also determined, however, that the Sun–Times had a legitimate right to limit the Union's work jurisdiction, transfer employees, and circumscribe the substitute hiring practice. Arbitrator Witney's decision became final and binding on the parties on December 19, 1989.

On January 10, 1990, the Union filed suit to reverse Arbitrator Witney's decision with respect to the work jurisdiction and substitute hiring issues, and to request clarification of the employee transfer finding. That litigation is currently pending before United States District Judge Ann C. Williams.

Meanwhile, the parties continued to negotiate a new collective bargaining agreement to replace the Main Agreement. After a year of negotiations, the Sun–Times made a "final offer" for a new agreement. This final offer, tendered January 26, 1990, incorporated the provisions of the Supplemental Agreement, proposals concerning wages and health/welfare benefits, and the package of rights upheld by Arbitrator Witney regarding work jurisdiction, employee transfers, and substitute hiring.

The Union rejected the Sun–Times' final offer. No negotiations concerning the new collective bargaining agreement have been held since January 26, 1990. The Union filed suit on April 9, 1990 seeking to compel arbitration of certain aspects of that final offer.

## SUMMARY JUDGMENT

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). Once the moving party has done this, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

The Union analogizes this matter to litigation arising out of its negotiations with the CNPA in 1984 and 1985. *See Chicago Typographical Union No. 16 v. Chicago Newspaper Publishers' Association*, 853 F.2d 506 (7th Cir.1988). There, the Seventh Circuit upheld the District Court's order compelling the CNPA to arbitrate certain aspects of a "final offer" for a new collective bargaining agreement. *Id.* at 510.

That case and the present matter are superficially similar. In *Chicago Newspaper*, the Union and the CNPA entered into a "Main Agreement," effective from 1979 to 1983. *Id.* at 507. The Supplemental Agreement of 1975 bound both sides as well. *Id.* The CNPA made a "final offer" for a new collective bargaining agreement. *Id.* at 508. The Union objected to that final offer, alleging violations of certain guarantees in the Supplemental Agreement. *Id.* The Union filed suit to compel arbitration. *Id.* The district court granted the Union's partial summary judgment motion and ordered arbitration. *Id.*

Despite the Union's assertions to the contrary, however, there are differences between the two situations. The key distinction between this matter and *Chicago Newspaper* is that in the earlier litigation the CNPA "unilaterally instituted the proposed changes" outlined in its final offer, thereby terminating the "Main Agreement." *Id.* Here, the Sun–Times has not implemented any of the terms or conditions of its final offer. The Main Agreement is still in effect. The Sun–Times made a proposal, and the Union rejected that proposal. The Sun–Times has not "unilaterally instituted the proposed changes."

*Chicago Newspaper* dealt with the question of whether "specific guarantees that [the Union] won in the Supplemental Agreement of 1975 *have been violated* by CNPA." *Id.* at 510 (emphasis added). It

did not address the question of *potential* or *hypothetical* violations. Certain changes had actually been implemented by the Sun–Times, not simply proposed or tendered as negotiating tools; given that reality, the Seventh Circuit upheld the Union's right to "protect the existing rights" of its employees "under the Supplemental Agreement of 1975." *Id.*

Here, however, the changes that the Union finds objectionable in the Sun–Times' proposal have not actually been implemented. Indeed, this present matter is more like another case involving these two parties than like *Chicago Newspaper.* Compare *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.,* 860 F.2d 1420 (7th Cir.1988) (no arbitration ordered; no dispute) *with Chicago Newspaper,* 853 F.2d 506 (7th Cir.1988) (arbitration ordered). In *Sun–Times,* the Union demanded arbitration over the Sun–Times' contemplated use of the section 7(a) "most favored nations" clause. *Sun–Times,* 860 F.2d at 1422. The Sun–Times, however, had not yet taken a position regarding its right to utilize section 7(a) in that particular context. *Id.* In fact, the Union had not turned over to the Sun–Times information relating to concessions allegedly given by it to the Tribune—information without which the Sun–Times could not formulate its position. *Id.* at 1422–23.

The Seventh Circuit held that for the Union to prevail in *Sun–Times,* it would have to show that the Sun–Times "has acted, or has threatened to act, in a manner inconsistent with the Union's interpretation of the contract.... Since the Union has failed to demonstrate that a dispute exists as to the meaning of the most favored nation clause, the district court was justified in refusing to order arbitration." *Id.* at 1426. In short, "no current, live dispute" existed between the Union and the Sun–Times. *Id.* at 1427.

In the present matter, the Sun–Times' final offer is just that—an offer. As such, it is analogous to a "contemplated use" and any question over its predicted impact when and if implemented falls short of the "controversy [or] ... disagreement as to interpretation or enforcement of the terms of th[e Main] Agreement" required by the arbitration clause in the Main Agreement.[3] *See id.* at 1421, 1427.

Moreover, the Main Agreement does not provide for an "advisory opinion" procedure, whereby questions which had not yet resulted in a conflict between the parties could be arbitrated. *See generally* F. Elkouri & E. Elkouri, *How Arbitration Works* 233–34 (4th ed. 1985) ("[t]he parties may specifically provide by contract for advisory opinions"), *cited in Sun–Times,* 860 F.2d at 1425. A review of the record indicates that the Union is attempting to force a resolution through arbitration of issues more properly suited for the negotiating table. Clearly, no arbitrable "controversy" or "disagreement" exists in this case.[4]

## CONCLUSION

We grant summary judgment in favor of the Sun–Times, and deny the Union's similar motion. Absent evidence that the terms of the Sun–Times' final offer have actually been implemented, arbitration of the impact of those terms on the Supplemental Agreement of 1975 is premature and inappropriate. It is so ordered.

---

**3.** The Union maintains that "[s]aid 'final offer' has been rejected by the Union, in part, because the ... 'final offer,' if accepted, would effective[ly] amend significant portions of the 1975 Supplemental Agreement." Union's complaint, ¶ 5. That contention is too speculative to create an arbitrable controversy or disagreement. *Sun–Times,* 860 F.2d at 1425.

**4.** We make no finding with respect to the predicted impact of the terms of a final offer on the guarantees found in the Main and Supplemental Agreements.