**CHICAGO TYPOGRAPHICAL UNION NO. 16, Plaintiff–Appellant,**

v.

**CHICAGO SUN–TIMES, INC., Defendant–Appellee.**

No. 88–1392.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1988.

Decided Oct. 31, 1988.

Gilbert A. Cornfield, Cornfield & Feldman, Chicago, Ill., for plaintiff-appellant.

Bernard D. Meltzer, Professor of Law, University of Chicago, Law School, Chicago, Ill., for defendant-appellee.

Before CUDAHY, POSNER and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

Plaintiff-appellant Chicago Typographical Union No. 16 (the "Union") commenced

this action to compel the defendant-appellee, Chicago Sun–Times, Inc. (the "Sun–Times"), to arbitrate a dispute over the proper interpretation of a collective bargaining agreement.[1] The district court found that the parties were not in "controversy [or] ... disagreement as to interpretation or enforcement of the terms of th[e] Agreement" as required by the contract's arbitration clause. The court refused to order arbitration of what it considered a non-existent dispute. It therefore dismissed the Union's complaint with prejudice. This appeal followed. We affirm.

## I.

The contract between the Union and the Sun–Times contains what is commonly known as a "most favored nation" clause.[2] Under this provision, the parties have agreed that if more advantageous terms or conditions of employment are "granted" by the Union to the Chicago Tribune (the "Tribune"), the Sun–Times will be allowed to implement the same terms and conditions or their equivalent.

The Union has been involved in continuing controversies with the Tribune over the last several years. The last collectively bargained agreement between the Union and the Tribune expired on January 14, 1983. After an impasse in bargaining had been reached, the Tribune posted its "final offer" of work terms and conditions on January 15, 1985. Negotiations continued, but to no avail; the Union declared a strike

on July 18, 1985. On February 10, 1986, the Union submitted an unconditional offer to return to work. Since that time, various union members have returned to work in the Tribune's composing room. The Union takes the position that its members' return to work under the terms unilaterally imposed by the Tribune does not constitute a "grant" of wage concessions by the Union, as that term is used in the most favored nation clause of the Union's agreement with the Sun–Times.

On August 21, 1987, Jack Nettis, Director of Personnel and Labor Relations for the Sun–Times, sent a letter to Dave Donovan, President of the Union. The letter recited that

In recent weeks, we have learned that there may have been actions taken by the Chicago Typographical Union No. 16 in 1986 or 1987, regarding terms and conditions of employment at the Chicago Tribune, that affect certain rights of the Chicago Sun–Times, Inc., under the labor contract between Chicago Sun–Times, Inc. and Chicago Typographical Union No. 16. In order to properly administer our labor contract and to insure the protection of the Company's rights under the labor contract, we request the Union provide us with the following information.

The letter went on to request various "correspondence, proposals and agreements" between the Union and the Tribune, relating to the terms and conditions of employ-

1. The Union invoked the district court's jurisdiction under section 301(a) of the Labor–Management Relations Act, 29 U.S.C. section 185(a), which provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties."

2. This clause, which appears under the heading "Uniformity of Agreement," provides:

If any terms regarding wages, hours or working conditions that affect the cost of operations in the Composing Room ... are granted to the Chicago Tribune during the life of this Agreement which are better or different and have the effect of reducing operating costs in the Composing Room, the Parties shall meet to review such terms or conces-

sions within five (5) days after such term or concession has been granted. Within ten (10) days after such meeting, the Office shall decide whether it wishes to implement such better or different terms or concessions or effectuate some other change affecting the cost of operation in the Composing Room. If the Office wishes to implement some other change, the Parties shall meet ... to determine whether agreement can be reached to implement such other change. If no agreement is reached within fifteen (15) days from the date the Parties meet to discuss implementing such other change, the Office may elect to implement such better or different terms or concessions granted to the Chicago Tribune forthwith.

Newspaper Contract and Scale of Prices, § 7(a).

ment of the Union's members in the Tribune's composing room.

Donovan responded on August 24. He stated that he "was not aware 'that there may have been actions taken by Chicago Typographical Union No. 16 in 1986 or 1987, regarding terms and conditions of employment at the Chicago Tribune.'" Donovan thanked Nettis for his "interest and concern," but otherwise provided no information concerning the terms and conditions under which members of the Union were working at the Tribune.

The correspondence assumed a somewhat less cordial character on August 31, when Nettis replied to Donovan's missive. Nettis reiterated the information request, noting that the information was required "in order to enable the Chicago Sun–Times, Inc., to administer the labor unit rate and protect its rights." Nettis also asserted that Donovan's "degree of awareness concerning the actions of Chicago Typographical Union No. 16 is not relevant to and does not relieve the Union of the Union's obligation to respond to the Company's legitimate information request." Nettis therefore requested that the Union promptly respond to the initial request for information.

On September 3, Donovan sent letters to Nettis and to Robert Page, the President and Publisher of the Sun–Times. The letter to Nettis stated that

Your letter of August 21, 1987, followed by your letter of August 31, 1987, and your recent actions in unilaterally cutting wages of the Mailers' bargaining unit *portends the same action by the Chicago Sun–Times* for its composing room employees under your interpretation of the "Uniformity of Agreement" of our contract (Section 7). The Union disputes your position that our contract grants authority to the Chicago Sun–Times to lower wages to ... wage rates which the Chicago Tribune may be paying strike-breakers or others hired since July 18, 1985....

The Union *will not* tolerate action by the Chicago Sun–Times in unilaterally cutting our negotiated wages under the guise of a fabricated interpretation of the Uniformity of Agreement provisions of our contract. Therefore, *the Union insists that we immediately arbitrate the issue whether the Union has "granted to the Chicago Tribune ... better or different ... operating costs in the Composing Room"* (which have the effect of reducing operating costs) within the meaning of Sections 7(a) and 7(b) of the bargaining agreement.

(second emphasis original). Donovan's letter to Page enclosed copies of his correspondence with Nettis, and observed that "[m]y letter of response to Mr. Nettis raises an issue over the interpretations [sic] and enforcement of provisions of our bargaining agreement," therefore creating an arbitrable dispute under the terms of the collective agreement.

Nettis responded to Donovan's letter on September 14. He stated that the Union's "grievance and request for arbitration is somewhat premature. We have made no decision, as yet, regarding whether the Chicago Sun–Times has the right to invoke the provisions of section 7(a) of our Labor Contract."

Despite the Sun–Times' avowal that it had not yet taken any position regarding the proper interpretation of section 7(a), the Union filed its complaint in the district court on September 15, 1987. The complaint states that the Union has "reason to believe" that the Sun–Times interprets the terms "grant" in the most favored nation clause as comprehending the terms under which Union members are working at the Tribune. Complaint, ¶ 12. Based on this apparent dispute, the Union seeks an order compelling the Sun–Times to submit to arbitration.

The Sun–Times moved to dismiss the action for failure to state a claim under Fed. R.Civ.P. 12(b)(6), arguing that there was no current dispute between the parties requiring arbitration. On February 2, 1988, the district court granted the Sun–Times' motion. The court observed that the contract only provided for arbitration of "disagreements" or "controversies" between the parties. Examining the correspondence be-

tween Donovan and Nettis, the court concluded that no arbitrable grievance existed.

The union insists that it has "reason to believe" that the Sun–Times has taken a position regarding Section 7(a) with which it disagrees, thus giving rise to an arbitrable "dispute." However, because of the union's refusal to date to disclose the information requested by the Sun–Times, the Sun–Times presently does not know what terms and conditions exist in the Tribune's Composing Room, or how those conditions came about. Thus, the Sun–Times is not even at this time in a position to *take* a position one way or another on whether it will invoke the provision of Section 7(a).

... That the union has a *belief* that the Sun–Times will adopt a position contrary to its own when it becomes aware of the facts is an insufficient basis on which to compel the Sun–Times to arbitrate, since the Agreement itself requires a "disagreement" or a "dispute." There is simply no contractual basis for arbitration in this case.

Mem. op. at 4–7 (emphasis original).

The court also noted, as "yet another basis for refusing to compel arbitration," that the Union's refusal to provide the requested information was the subject of a pending unfair labor practice proceeding before the National Labor Relations Board. Since, according to the district court, "when an activity is even arguably subject to Section 8 of the [National Labor Relations] Act, federal courts must defer to the exclusive competence of the NRLB [sic]," the court considered its refusal to order arbitration particularly appropriate.

## II.

The Supreme Court has recently reaffirmed the general principles which must guide a court in an action seeking to compel arbitration of a labor dispute. Quoting liberally from its twenty-five-year-old decisions in the *Steelworkers Trilogy*,[3] the Court enumerated four basic principles which are relevant to a suit to compel arbitration.

The first principle gleaned from the *Trilogy* is that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." . . .

The second rule, which follows inexorably from the first, is that the question of arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination. . . .

. . . . .

The third principle derived from our prior cases is that, in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator. . . .

Finally, it has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." . . .

*AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648–50, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986) (citations omitted).

While the quoted language suggests quite broadly that "the question of arbitrability . . . is undeniably an issue for judicial

---

**3.** *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Steelworkers v. Enterprise Wheel & Car Co.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

determination," in other cases the Supreme Court has indicated that the court is only to decide whether the *subject matter* of a dispute is within the coverage of the applicable arbitration clause. Questions of "procedural arbitrability" are matters for the arbitrator. For example, in *John Wiley & Sons v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Court held that whether a union had complied with the procedural steps necessary to preserve its right to arbitration was a question for the arbitrator. The Court stated:

> Doubt whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration.... *Once it is determined*, as we have, *that the parties are obligated to submit the subject matter of a dispute to arbitration, "procedural" questions which grow out of the*

dispute and bear on its final disposition should be left to the arbitrator. *Id.* at 557–58, 84 S.Ct. at 918 (emphasis added). *See also International Union of Operating Eng'rs, Local 150 v. Flair Builders, Inc.*, 406 U.S. 487, 491–92, 92 S.Ct. 1710, 1712–13, 32 L.Ed.2d 248 (1972); *Alabama Power Co. v. Local Union No. 391, Int'l Bhd. of Elec. Workers*, 612 F.2d 960, 963 (5th Cir.1980) ("If the *subject matter* of the dispute is arguably arbitrable (resolving all doubts in favor of coverage), then it is for the arbitrator to decide whether or not the dispute may be arbitrated."). Procedural issues, including the standing of a party to the arbitration, the *res judicata* effect of a prior arbitration award and the timeliness of filing a grievance, are for the arbitrator, so long as the *subject matter* of the dispute is within the arbitration clause.[4]

## III.

In the present case, the Sun–Times apparently accepts that the subject matter of this grievance, the proper interpretation of the most favored nation clause,[5] is within

---

**4.** *See, e.g., Niro v. Fearn Int'l, Inc.*, 827 F.2d 173, 175–76 (7th Cir.1987) (failure to follow procedural steps preliminary to arbitration; "[t]he arbitrator should determine the effect of any 'procedural' shortcomings of either party."); *Local No. 406, Int'l Union of Operating Eng'rs v. Austin Co.*, 784 F.2d 1262, 1265 (5th Cir.1986) (timeliness of filing grievance; "Once it is decided that a dispute is covered by the arbitration agreement, procedural questions are for the arbitrator."); *Denhardt v. Trailways, Inc.*, 767 F.2d 687, 690 (10th Cir.1985) (timeliness of filing grievance); *Beer Sales Drivers, Local 744 v. Metropolitan Distribs., Inc.*, 763 F.2d 300, 302–03 (7th Cir.1985) (same); *Washington Hospital Center v. Service Employees Int'l Union, Local 722*, 746 F.2d 1503, 1507–08 (D.C.Cir.1984) (same); *Automotive Employees v. Town and Country Ford, Inc.*, 709 F.2d 509 (8th Cir.1983) (same); *Chauffeurs Local Union No. 765 v. Stroehmann Bros. Co.*, 625 F.2d 1092 (3d Cir.1980) (same); *Little Six Corp. v. UMW*, 701 F.2d 26 (4th Cir. 1983) (res judicata effect of prior arbitration award); *Steelworkers v. Smoke–Craft, Inc.*, 652 F.2d 1356, 1360 (9th Cir.1981) ("Whether the Steelworkers had standing as a party to the arbitration, which had been properly commenced, was a procedural matter for the determination of the arbitrator."), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1718, 72 L.Ed.2d 139 (1982); *but see General Drivers, Local Union 89 v. Moog Louisville Warehouse*, 852 F.2d 871, 873–75 (6th Cir.1988) (timeliness of grievance should be de-

termined by court if contract unequivocally prohibits arbitration of untimely grievances).

**5.** At oral argument, the Union's attorney stated that the underlying dispute involved the propriety of the Sun–Times' information request, and not the interpretation of the term "granted" in the most favored nation clause. The difference between these two formulations of the issue is fairly minor, since the propriety of the Sun–Times' information request would ultimately depend on whether the request was relevant to the Sun–Times' rights under the contract, which in turn would require some interpretation of the most favored nation clause.

More importantly, however, we note that throughout the course of this controversy the Union has claimed that the dispute involves the interpretation of the most favored nation clause, and not the Sun–Times' information request *per se. See* Letter from Dave Donovan to Jack Nettis (Sept. 3, 1987), quoted *supra* at 1422; Complaint at ¶ 12; Plaintiff's Opposition to Defendant's Motion to Extend Time to Answer at 1–2. In fact, the Union sought to counter the argument that arbitration would interfere with the pending unfair labor practice proceeding by arguing that the request for arbitration did *not* involve the propriety of the information request; instead, it argued, "[t]he Union seeks a binding interpretation of the scope of the meaning of a 'grant' of 'concessions' under

the scope of the arbitration provision. However, the Sun–Times argues quite vigorously that there is no current dispute between the parties and that the arbitration machinery of the collective agreement therefore cannot be invoked.

As an abstract matter, there may be some room for doubt whether it is the role of the court to determine if a live "controversy" or "disagreement" exists between the parties, in the sense in which those terms are employed in an arbitration clause. As noted above, there is authority that the court should inquire only whether the subject matter of a dispute is within the arbitration clause, leaving the arguably procedural issue of "ripeness" to the arbitrator. Whether parties have assumed a position of concrete adversity, so that the issues are effectively and vigorously presented to the arbitrator, might be the sort of procedural issue which is properly left for the arbitrator's decision. Fortunately, we need not address the perhaps difficult question of where this "ripeness" issue falls on the substantive/procedural continuum.[6] For throughout this litigation both the Union and the Sun–Times have agreed that the question whether a "dispute" exists, and therefore whether the current issue is arbitrable, is for the court. Since the parties agree that the question of arbitrability is a matter for this court to decide and since this is not a threshold issue going to subject matter jurisdiction, any argument based on "procedural arbitrability" has been waived, and we accept the issue as presented.

■ Turning to the issue as framed by the parties, we conclude that the district court was fully justified in refusing to order arbitration. While the contract could have established an "advisory opinion" procedure, whereby questions which had not yet resulted in a conflict between the parties could be arbitrated, it does not do so. *See* F. Elkouri & E. Elkouri, *How Arbitration Works* 233–34 (4th ed. 1985) (noting that "[t]he parties may specifically provide by contract for advisory opinions."). Instead, the arbitration clause refers consistently to "controversies" and "disagreements" regarding the interpretation and application of the contract. And it is clear that no arbitrable "controversy" or "disagreement" exists in this case. A review of the record indicates that throughout this litigation the Union has been attempting to *impute an interpretation of the contract* to the Sun–Times for the purpose of creating an issue for arbitration. As the district court aptly stated, "the Sun–Times is not ... in a position to *take* a position" on the application of section 7(a) to the terms and conditions of employment prevailing at the Tribune.

The Ninth Circuit dealt with a very similar situation in *Alpha Beta Co. v. Retail Store Employees Union, Local 428,* 671 F.2d 1247 (1982). In that case, the union and the employer had entered into a settlement agreement regarding the proper interpretation of a contract clause. The employer subsequently began to suspect that the union was preparing to espouse a different interpretation of the clause, con-

Section 7(a) of the contract." Plaintiff's Reply to Defendant's Motion to Dismiss at 12.

In this Court, the Union describes the prior course of the controversy in unequivocal terms: The Union maintained that the parties were in dispute *whether the wages and benefits of strike replacements and others who may be employed at the Tribune could be considered a "concession" pursuant to a "grant" by the Union.* The Union offered to submit that dispute to *immediate* arbitration....
Brief of Plaintiff–Appellant at 8 (first emphasis added; citation omitted). *But see id.* at 1 (statement of the issue on appeal: "Can a dispute over *whether the demand for information by one party to another to a collective bargaining agreement which is founded upon contractual rights*

*reasonably be a 'grievance' under the agreement?"*) (emphasis added). We will only rule on the issue which was presented below and (with some inconsistency) on appeal, without considering the Union's newly created "dispute" over the propriety of the information request.

**6.** Drawing a principled distinction between "substance" and "procedure" is an intractable problem, and one which has confounded many able judges. *See, e.g., Hanna v. Plumer,* 380 U.S. 460, 464–74, 85 S.Ct. 1136, 1140–46, 14 L.Ed.2d 8 (1965) (Warren, C.J.); *id.* at 475–78, 85 S.Ct. at 1146–48 (Harlan, J., concurring); *Guaranty Trust Co. v. York,* 326 U.S. 99, 107–10, 65 S.Ct. 1464, 1469–70, 89 L.Ed. 2079 (1945) (Frankfurter, J.).

trary to the settlement agreement, which purported to be "final and binding." The employer sued to compel the union to arbitrate this "dispute." The Court observed that, in order to prevail in its suit to compel arbitration, the employer "must establish that a dispute exists." *Id.* at 1250. The employer's evidence consisted of a letter of one of its own officers, which stated that he was "now informed that Local 428 is going to take [a] position" contrary to the settlement agreement. The Court found that the employer's unsupported suspicions that the union was preparing to take a position did not create an arbitrable dispute over the interpretation of the contract.

We find the reasoning of the Ninth Circuit persuasive. In order to prevail in this case, the Union must show that the Sun–Times has acted, or has threatened to act, in a manner inconsistent with the Union's interpretation of the contract. As in *Alpha Beta Co.*, the Union can only point to the self-serving statements of its President, Dave Donovan, to support its claim that the Sun–Times has taken a position on the interpretation of section 7(a). The Sun–Times has consistently denied that it has decided how to respond to the work conditions prevailing at the Tribune. Since the Union has failed to demonstrate that a dispute exists as to the meaning of the most favored nation clause, the district court was justified in refusing to order arbitration.[7]

What has been said to this point is sufficient to justify affirmance of the district court. However, the district court did not rest its dismissal solely on the basis that no "disagreement" or "controversy" existed between the parties. The court also suggested, as "yet another basis for refusing to compel arbitration," that it was required to abstain from deciding the merits of the dispute because the General Counsel of the NLRB had issued an unfair labor practice charge involving the Union's refusal to pro-

vide the information requested by the Sun–Times. Mem. op. at 7 ("when an activity is even arguably subject to Section 8 of the Act, federal courts must defer to the exclusive competence of the NRLB [sic]"). In support of its conclusion that deference was appropriate, the district court cited two decisions involving federal preemption of *state tort actions*. *Id.*, citing *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959), and *Kolentus v. Avco Corp.*, 798 F.2d 949, 951 (7th Cir.1986), *cert. denied*, 479 U.S. 1032, 107 S.Ct. 878, 93 L.Ed. 2d 832 (1987).

The principles which mandate preemption of state law claims where activities are regulated by the National Labor Relations Act do not apply to suits under section 301 of the Labor–Management Relations Act. By ordering arbitration in a section 301 case, the court does not interfere with congressional policy—instead, the court affirmatively implements one of the overriding purposes of the federal labor laws, that private dispute resolution processes function in the manner agreed to in the labor contract. Section 301 was enacted to insure that contracting parties had effective means of enforcing their rights under the collective agreement. It would be contrary to congressional policy to refuse to exercise the jurisdiction granted by section 301 whenever a dispute was "arguably" subject to the unfair labor practice jurisdiction of the NLRB.

The Supreme Court has expressly held that the *Garmon* rationale is not applicable to suits under section 301. "The strong policy favoring judicial enforcement of collective-bargaining contracts [is] sufficiently powerful to sustain the jurisdiction of the district courts over enforcement suits even though the conduct involved [is] arguably or would amount to an unfair labor practice within the jurisdiction of the [NLRB]." *Hines v. Anchor Motor Freight, Inc.*, 424

---

7. We find support for our interpretation of the collective agreement in the observation that "[a]rbitrators generally are reluctant to issue advisory opinions or 'declaratory judgments'" under arbitration clauses which only provide for arbitration of "disputes," "controversies,"

"conflicts" or "disagreements." F. Elkouri & E. Elkouri, *How Arbitration Works* 233 (4th ed. 1985); *see also id.* at 233 nn. 54–56 (citing numerous arbitral decisions refusing to render advisory opinions).

U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed. 2d 231 (1976); *see also William E. Arnold Co. v. Carpenters Dist. Council*, 417 U.S. 12, 16, 94 S.Ct. 2069, 2072, 40 L.Ed.2d 620 (1974) ("the *Garmon* doctrine is 'not relevant' to actions within the purview of § 301"); *Smith v. Evening News Ass'n*, 371 U.S. 195, 197, 83 S.Ct. 267, 268, 9 L.Ed.2d 246 (1962); *Emery Air Freight Co. v. Local 295, Int'l Bhd. of Teamsters*, 786 F.2d 93, 100 (2d Cir.1986) ("The NLRB and arbitrators have concurrent, overlapping jurisdiction over many labor disputes and the NLRB may either defer to the arbitrator's award or, if the latter is inconsistent with established law, disregard it."); *Lewis v. Local 100, Laborers' Int'l Union*, 750 F.2d 1368, 1372 (7th Cir.1984); *Local 807, Int'l Bhd. of Teamsters v. Brink's Inc.*, 744 F.2d 283, 286 (2d Cir. 1984); *Alpha Beta Co.*, 671 F.2d at 1249. In cases where there is a potential overlap between the jurisdiction of court and Board, the court's section 301 inquiry does not change. The court must simply ask whether the claims asserted are founded on the contract (whether or not there might also be a statutory basis for the rights or obligations which the complaining party seeks to enforce). The NLRB will determine what weight, if any, to give to the eventual arbitral award; the court need not concern itself with the potential for "interference" between the arbitration and the Board proceeding.

## IV.

The district court was clearly right when it held that there was no current, live dispute between the parties as to the proper interpretation of the collective bargaining agreement. Since this arguably procedural issue had been submitted for the court's decision, the district court was entirely justified in dismissing the complaint. However, the district court's further observations regarding the relationship between section 301 and the NLRB's unfair labor practice jurisdiction appear to be incorrect. But this has no effect on the result.

For these reasons the judgment of the district court is

AFFIRMED.