**NATIONAL WRECKING COMPANY,**
**Plaintiff/Counterdefendant,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL NO. 731,**
**Defendant/Counterplaintiff.**

**No. 91 C 5526.**

United States District Court,
N.D. Illinois, E.D.

April 20, 1992.
On Motion to Amend May 14, 1992.

---

Richard G. Schultz, Douglas R. Stevens, Foran, Wiss & Schultz, Chicago, Ill., for plaintiff/counterdefendant.

Robert E. Bloch, Dowd & Bloch, Chicago, Ill., for defendant/counterplaintiff.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

National Wrecking Company ("National") has sued International Brotherhood of Teamsters, Local No. 731 ("Union") seeking to vacate an arbitration award (the "Award"), and Union has in turn counterclaimed for enforcement of the Award plus some related additional relief. National now moves under Fed.R.Civ.P. ("Rule") 56 for summary judgment on its claim, while Union moves for summary judgment on its counterclaim.[1] For the reasons stated in this memorandum opinion and order:

1. National's Rule 56 motion is denied, and its action to vacate the Award is dismissed.

2. Summary judgment is granted in Union's favor on its counterclaim to enforce the Award, but only as originally rendered.

### Facts

National and Union entered into a Collective Bargaining Agreement ("CBA") that required them to follow certain grievance and arbitration procedures (Ex. J–1, CBA §§ 6.1–6.12). National was also subject to United States Department of Transportation ("DOT") regulations requiring truck drivers in its employ to meet certain vision standards (49 C.F.R. § 391.41(b)(10)). Where the CBA and the DOT regulations intersect, this case begins.

On March 8, 1990 National fired truck driver Joseph Barnett ("Barnett") based on the oral report of an ophthalmologist who said that Barnett's vision fell short of DOT requirements (Tr. 145–46; Ex. C–8). Barnett filed a grievance with Union the same day, challenging his dismissal (Ex. C–2, the "March 8 grievance"). On March 28 the Joint Area Committee designated to hear Barnett's grievance held a hearing, but it deadlocked. Barnett learned of that result the same day from Union's president James Lisner ("Lisner") (Tr. 148–49). Barnett was formally advised of the deadlock by a letter dated April 20 (Ex. C–1).

Barnett then filed for arbitration. There is some dispute about whether he did so within the 30–day time frame set by CBA § 6.10. National says that it first received notice of the request for arbitration in an undated letter from Lisner that it claims to have received on or about June 13, well beyond the 30–day limit (Ex. C–3). Union counters with evidence that the request was timely filed (Tr. 184–87; Exs. U–6 to U–8; Max Becker Aff. ¶ 3). As will be shown below, that factual dispute does not bear on the outcome of the case.

Along with the undated letter Lisner enclosed a second grievance relating to Barnett's dismissal. Apparently that later

---

1. National attached to its opening Memorandum the various documents from the arbitration proceeding: its transcript (cited "Tr.—"), National's exhibits ("Ex. C—" [for "Company"]),

Union's exhibits ("Ex. U—") and joint exhibits ("Ex. J—"). Other submissions by the parties to this Court will be given self-explanatory designations in this opinion.

grievance merely restated the claims made in the first. No grievance committee ever considered the second grievance, nor did the arbitrator evaluate it on the merits. Hence this opinion will not mention the second grievance again.

Barnett underwent four eye exams in the eight months leading up to the arbitration hearing. Two of those exams, each apparently commissioned by National, indicated that Barnett's eyesight fell short of DOT requirements (Exs. C-5, C-8). Two other exams, each apparently conducted at Union's behest, indicated that Barnett's eyesight was adequate (Exs. U-2, U-4). Another exam conducted two years earlier had also found his eyesight adequate (Ex. C-6).

Arbitrator Albert Epstein conducted a hearing on October 19 and 29, 1990, then issued his Award on January 30, 1991. In a 30-page opinion he reviewed the case thoroughly, noting the conflicting evidence on timeliness and on visual acuity. Arbitrator Epstein found that the March 8 grievance had been timely filed, citing the principle that an arbitrator should generally resolve disputes over timeliness in the grievant's favor (Award 26–27):

> This principle is established upon the general basis that the merits of a grievance should be considered by an arbitrator whenever possible and that the Grievant should not be disenfranchised by virtue of a technical disqualification.

Thus Arbitrator Epstein did not actually resolve the evidentiary conflict. Instead he took note of the conflict and drew upon a general rule to choose a winner on the timeliness issue.

Next Arbitrator Epstein referred to the "barrage of conflicting diagnoses" on visual acuity, but he declined to choose among the diagnoses himself (id. 27–28). Instead he ordered that Barnett undergo yet another examination, this time by a neutral ophthalmologist to be selected by the parties within ten days. If the parties could not agree on a new ophthalmologist, Arbitrator Epstein would appoint one (id. 28). In either case the findings of the neutral ophthalmologist would bind the parties. If the doctor found Barnett's vision adequate he would win his job back, with restoration of seniority and pension rights but no back pay. If the doctor found that Barnett's vision fell short of DOT regulations, then the grievance would be resolved in National's favor (id. 30).

National and Union could not agree on an ophthalmologist, so Arbitrator Epstein appointed Dr. Robert Levine. On March 18, 1991 Barnett visited Dr. Levine's office in downtown Chicago for the sixth and last exam relevant to this case. In a letter summarizing the results of that exam (National Ex. Mar. 30, 1991 Letter), Dr. Levine did not say outright whether Barnett's vision met DOT standards. Nor was any clear answer to that question evident on the face of the letter. Arbitrator Epstein responded by asking the doctor point-blank, in writing and over the phone, for an opinion on whether Barnett's visual acuity met DOT standards (National Exs. May 13, 1991 Letter (requesting an opinion) and July 9, 1991 Letter (reflecting phone conversations to the same effect)).

Dr. Levine finally rendered an unequivocal written opinion to the effect that Barnett saw well enough to drive a truck under the federal regulations (National Ex. June 27, 1991 Letter). Arbitrator Epstein forwarded that opinion to the parties, adding that they were to "share [its cost] according to the terms of my award in the arbitration proceeding" (National Ex. July 9, 1991 Letter). Rather than grant Barnett reinstatement and back benefits, National filed its motion to vacate. Union responded with its motion for confirmation and enforcement.

### Rule 56 Principles

Familiar Rule 56 doctrine imposes on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). Hence this Court must draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant (*De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). Where cross-motions are involved (and what the parties present here are cross-motions in substance, though not

in form), that principle demands a dual perspective that sometimes causes the denial of both motions—though as this opinion's substantive discussion will reflect, that result does not obtain here.

■ To avoid confusion from the cross-motion structure, the bulk of this opinion is cast in the form of a review of National's motion. At the end Union's motion is taken up separately. On each motion Rule 56 requires this Court to rule in the movant's favor if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." To demonstrate that an issue is genuine the moving party must cite to some evidence in the record sufficient to suggest that its view of the issue might be adopted by a reasonable factfinder (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1304 (7th Cir. 1991)). To demonstrate that an issue is material the moving party must show that the issue is outcome-determinative under the applicable substantive law (*Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir.1991)). Accordingly this opinion next outlines the principles governing judicial review of arbitration awards.

### What Statute Governs?

■ Two statutes conceivably apply to this case. National has brought suit under the Federal Arbitration Act, 9 U.S.C. §§ 1–16, which explicitly authorizes judicial review of arbitration awards. That statute applies primarily to commercial arbitration—indeed, its language expressly forbids judicial review of arbitration arising out of "contracts of employment of ... workers engaged in interstate commerce" (*id.* § 1).[2] More to the point, Labor Management Relations Act § 301, 29 U.S.C. § 185 ("Section 301") expressly provides for judicial review of any "violation of contracts between an employer and a labor organization[.]" As was true in this case, the duty to arbitrate typically arises from the CBA itself. Hence when an arbitrator improperly discharges his or her duties or when a party to the CBA refuses to honor an arbitrator's ruling, there has been a "violation of contract[ ]" actionable under Section 301 and a federal cause of action exists.

■ *Miller Brewing*, 739 F.2d at 1162 makes it plain that National has sued under the wrong law:

> But section 301 was enacted long after the Arbitration Act and deals specifically, as the Arbitration Act does not, with labor contracts; it therefore supersedes, within its domain, the standards of the earlier act.

Thus no award arising from a CBA-mandated arbitration proceeding is reviewable under the Arbitration Act.

But that marks the beginning rather than the end of the analysis. Courts have construed Section 301 and the Arbitration Act to embody largely similar doctrines of judicial deference to the decisions of arbitrators. If the two statutes are not identical twins, they are at least kissing cousins—"federal courts have often looked to the [Arbitration] Act for guidance in labor arbitration cases" (*United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 40 n. 9, 108 S.Ct. 364, 372 n. 9, 98 L.Ed.2d 286 (1987)). Courts routinely cite decisions under one statute as authority for decisions under the other.

■ Ordinarily a court has no business searching out the proper statute to supply a plaintiff's cause of action. But rights of action are a function of the facts of a case, not of the legal theories that may or may not have been advanced by the plaintiff (*Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir.1992); see *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104

**2.** To anyone accustomed to the broad judicial reading given to the term "interstate commerce" since the early days of the Franklin Roosevelt presidency, that exception is not as sweeping as it sounds. See, e.g., such cases as *Miller Brewing Co. v. Brewery Workers Local Union No. 9*, 739 F.2d 1159, 1162 (7th Cir.1984), reaffirming earlier cases that had limited the quoted exclusion under the Arbitration Act to workers employed in the transportation industries; but cf. *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 310–12 (6th Cir.1991) (giving the exception a substantially broader reading).

S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). Certainly when (as in this case) the legal principles supplied by the properly applicable statute so closely resemble the principles supplied by the inapplicable statute cited by the plaintiff, the better course is to go ahead and review the claim as if National had brought suit under the right law: here Section 301. Because relief under that section proves unavailable to National in all events, no prejudice to Union can result from this lenient approach.

### Section 301 Standards

■■■ When parties agree to arbitration they consciously trade the safeguards of full-fledged adjudication in the courts for the greater speed and lower costs of alternative dispute resolution (*E.I. DuPont de Nemours & Co. v. Grasselli Employees Independent Ass'n of East Chicago, Inc.*, 790 F.2d 611, 614 (7th Cir.1986)). Courts extend extraordinary deference to the decisions of arbitrators, thus "prevent[ing] a 'judicialization' of the arbitration process" (*id.*) that would allow the losing party to evade the consequences of this initial bargain. *Misco*, 484 U.S. at 36, 108 S.Ct. at 369–70 (citation omitted) teaches, quoting from one case in the *Steelworkers Trilogy* (*United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)):

> As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate.

That principle holds true even if the arbitrator makes plain errors of fact or law (*id.* 484 U.S. at 38, 108 S.Ct. at 371).

National offers three arguments in support of its attempt to defeat the general policy of deference to the arbitrator's award. Brief analysis shows each contention to be unpersuasive.

### Delegation

■■■ National first asserts that Arbitrator Epstein went beyond the "essence of the contract" when he chose to rely on a neutral ophthalmologist to break the logjam of competing diagnoses. CBA § 6.10 bound the parties to accept the final decision of "the arbitrator"—not the final decision of a doctor designated by the arbitrator.

Legal technicalities aside, Arbitrator Epstein's job was to decide how well Barnett could see. According to the first five eye exams, Barnett seemed to see better or worse depending in part on whether Union or National commissioned the exam. And so it was that Arbitrator Epstein chose to commission a sixth report from a neutral expert, whose findings would control the outcome of the case.

Arbitrator Epstein was clearly within the scope of his authority to commission a report from a neutral expert on issues essential to the case (*Sunshine Mining Co. v. United Steelworkers of America*, 823 F.2d 1289, 1295 (9th Cir.1987)). But he had an obligation to "carefully evaluate[ ] and weigh[ ]" the expert's ultimate submission (*id.*). Accordingly the question becomes whether Arbitrator Epstein properly evaluated and weighed Dr. Levine's report, or whether he merely punted to the neutral doctor.

It is not entirely clear from the record just how carefully Arbitrator Epstein reviewed Dr. Levine's report. But without question, in at least one letter and in more than one phone conversation Arbitrator Epstein did press Dr. Levine for a more specific explanation of his findings. It is also reasonable to infer (granting the pro-Union inferences mandated by Rule 56 on National's motion) that in light of the general thoroughness reflected by his written opinion, Arbitrator Epstein must have reviewed Dr. Levine's report carefully enough to determine that it was intrinsically reliable.

■■■ Moreover, the extent of an arbitrator's obligation to evaluate and weigh must depend on the sort of evidence at issue. Where technical medical evidence is in dispute and the arbitrator lacks the scientific skills necessary to reconcile the conflicting evidence on the merits, greater reliance on a neutral expert becomes not only permissible but very nearly necessary. Otherwise the arbitrator must play ophthalmologist,

and it would distort the notion that the parties have vested the decisionmaking function in their chosen arbitrator to hold that by doing so they have appointed a lawyer-cum-doctor. For that reason arbitration agreements occasionally mandate reliance on the findings of a neutral doctor, and binding reports by neutral doctors are occasionally requested by arbitrators (either sua sponte or with the parties' permission) where the agreement does not so mandate (Frank Elkouri & Edna Asper Elkouri, *How Arbitration Works* 339 (4th ed. 1985)).

All in all, two reasons appear to make it eminently reasonable for Arbitrator Epstein to have used an independent expert in the way that he did:

> 1. At least for purposes of National's motion (see n. 5), with its compelled inferences in favor of Union, he adequately discharged his duty to evaluate (as prescribed by *Sunshine Mining*) in light of the technical nature of the evidence.
>
> 2. Reliance on a neutral doctor seems to be the sort of approach that the parties might well have approved had they dealt with the problem at the time of contracting.

On the latter point, for an arbitrator to resolve a contract dispute just as the parties would likely have done ex ante is to do what judges do every day when interpreting contracts (cf. *Hill v. Norfolk & Western Ry.*, 814 F.2d 1192, 1198 (7th Cir.1987) (arbitrator empowered to interpret both implicit and explicit contract terms)). Thus even if Arbitrator Epstein had effectively redesignated Dr. Levine as a subarbitrator, that would not have gone beyond the "essence of the contract."

■ But this Court need not travel any such inferential path to reach the destination of National's defeat. Even if it were to be assumed arguendo that Arbitrator Epstein had crossed the line between permissible consultation with an expert and forbidden delegation, National nonetheless failed to raise that objection in the original proceedings before Arbitrator Epstein.

And that failure is fatal to National's motion to vacate.

It is well settled that a district court may not consider objections or legal theories not raised before the arbitrator (*United Food & Commercial Workers Local 100A v. John Hofmeister & Son, Inc.*, 950 F.2d 1340, 1343–44 (7th Cir.1991)).[3] National seeks to avoid that rule by contending that the error in Arbitrator Epstein's reliance on Dr. Levine became apparent only at the end of the process, when Arbitrator Epstein demanded that Dr. Levine produce an opinion on whether Barnett's vision met DOT regulations (National R.Mem. 5). National therefore urges that the waiver rule of *Hofmeister* and innumerable other cases should not apply.

Yet Arbitrator Epstein made clear in his January 30, 1991 written opinion that he intended to rely *completely* on Dr. Levine "to issue a final determination" (Award at 28) as to whether Barnett was "visually qualified under the Department of Transportation regulations" (*id.* at 30). Thus National knew from January 30 onward that Arbitrator Epstein intended that Dr. Levine render a binding opinion tailored to the DOT regulations—making what National now characterizes as an impermissible "legal" judgment.

If National thought that such a degree of reliance on a neutral expert constituted legal error, it had an obligation to raise that argument directly to Arbitrator Epstein at some point during the five full months that elapsed between issuance of the written opinion and the July 9, 1991 letter in which Arbitrator Epstein adopted Dr. Levine's pro-Barnett conclusion. But far from objecting to the procedure adopted by Arbitrator Epstein, instead National openly cooperated with Dr. Levine: Ex. C to Union's Statement under this District Court's General Rule 12(m) is a February 27, 1991 letter from National's lawyers to Dr. Levine forwarding a number of materials to him at Arbitrator Epstein's request, explaining Barnett's job requirements as

---

**3.** *Hofmeister* applies that anti-"[s]andbagging" (*id.* at 1344) principle in the context of barring new defense theories in an arbitration enforcement proceeding, not on a motion to vacate. But the principle obviously applies to both sorts of proceedings, especially because National uses the same delegation argument both to support its motion to vacate and as an affirmative defense to Union's enforcement motion.

background for Dr. Levine's determination and—most importantly—beginning with an express recognition of the contemplated finality of Dr. Levine's determination as to Barnett's meeting or not meeting the DOT standards:

> We have been informed of your appointment by Arbitrator Albert A. Epstein to examine Mr. Joseph Barnett. It is our understanding that you will issue a final determination as to Mr. Barnett's qualifications under the U.S. Department of Transportation's vision requirements for drivers.[4]

That means that National is engaged here in an impermissible effort at second-guessing—having lost in a procedure in which it participated without any objection, it now seeks to quarrel with Dr. Levine's conclusion. It cannot thus belatedly dispute the concept of the arbitrator's reliance on a neutral expert. By failing to make the delegation argument below, National has waived the right to make it in this Court.

### Public Policy

National next argues that the Award in favor of Barnett violated public policy. That sort of argument is much favored by losing parties in arbitration cases for reasons explained in *E.I. DuPont,* 790 F.2d at 615, quoting *W.R. Grace & Co. v. Rubber Workers Local 759,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983):

> Unlike a review of the merits of the award itself, where, as illustrated above [in a host of cited cases], there must be strong deference to the arbitrator, the question of whether the award violates public policy "is ultimately one for resolution by the courts."

Arbitrator Epstein's Award allegedly violated the public policy in favor of having big trucks driven by people with good eyesight. By adopting Dr. Levine's conclusions, Arbitrator Epstein in effect decided that Barnett could indeed see well enough

to drive a truck. That decision constituted a simultaneous finding of fact (that Barnett could see as well as Dr. Levine said he could) and conclusion of law (that the level of visual acuity reported by Dr. Levine corresponded with DOT regulations). To evaluate National's public-policy argument, therefore, this Court would have to begin by rejecting Arbitrator Epstein's finding of fact.

Unfortunately for National, *E.I. DuPont,* 790 F.2d at 615 forbids such a maneuver:

> Where an arbitration award has been overturned on public policy considerations, the court has not questioned the factual findings of the arbitrator. Rather, the court has found that, assuming all of the facts found below are true, the enforcement of the award will violate a public policy.

Just this month our Court of Appeals has reaffirmed this principle in *Chrysler Motors Corp. v. Internat'l Union, Allied Industrial Workers of America,* 959 F.2d 685, 689 n. 4 (7th Cir.1992).

■ In other words, the losing party in an arbitration proceeding cannot use public policy arguments to stage a backdoor attack on the arbitrator's factual findings. Speaking in just such a public-policy-attack context, *Misco,* 484 U.S. at 39, 108 S.Ct. at 371 makes that crystal clear:

> No dishonesty is alleged; only improvident, even silly, factfinding is claimed. This is hardly a sufficient basis for disregarding what the agent appointed by the parties determined to be the historical facts.

National's public-policy argument too must fail.

### Timeliness

■ Finally, National asserts that Arbitrator Epstein went beyond the "essence of the contract" by deciding an untimely claim. There is some dispute, noted above,

---

4. [Footnote by this Court] Before this Court National is represented by a different law firm from the one that handled the arbitration. But that does not excuse the new law firm's making an argument that could not have been advanced in good faith by its predecessor. At best the issue is converted from one of subjective bad

faith (the situation if the original lawyers had made the argument in the face of their own acquiescence in the procedure adopted by Arbitrator Epstein) to one of the new law firm's failure to investigate adequately before making the argument—a potential violation of the objective standard dictated by Rule 11.

about whether Union timely filed its request for arbitration. Arbitrator Epstein considered the conflicting evidence on that issue and decided in Union's favor, citing the general rule favoring resolution of a grievant's substantive claims despite procedural default. In reaching his decision Arbitrator Epstein undeniably drew on the "essence of the contract" in the sense that the CBA must be said to embody general principles of arbitral law.

More importantly, this Court cannot disturb Arbitrator Epstein's decision on timeliness under the straightforward rule of *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.,* 860 F.2d 1420, 1424 (7th Cir.1988) (emphasis added in part):

> Procedural issues, including the standing of a party to the arbitration, the *res judicata* effect of a prior arbitration award and the *timeliness of filing a grievance,* are for the arbitrator, so long as the *subject matter* of the dispute is within the arbitration clause.

National does not contend that the subject matter of this dispute fell outside the scope of the CBA's arbitration clause. Hence the arbitrator's decision on timeliness must stand.

\* \* \* \* \* \*

In sum, none of National's arguments in favor of vacating the Award calls for that result. Its motion for summary judgment must be denied, and its action to vacate the Award must be dismissed.

### Union's Motion for Confirmation and Enforcement

■ Union has moved under Section 301 for confirmation and enforcement of Arbitrator Epstein's Award, and it seeks summary judgment on that motion. Ordinarily the winning party is entitled to judicial enforcement of an arbitration award, on the theory that the loser's failure to honor the award constitutes a breach of the CBA's arbitration provisions (*Evans v. Ein-*

*horn,* 855 F.2d 1245, 1253 (7th Cir.1988) (District Judge Rovner's opinion, *aff'd* per curiam). Judicial enforcement of the award forms the labor law equivalent of specific performance in an ordinary contract action (*Textile Workers Union v. Lincoln Mills of Alabama,* 353 U.S. 448, 451, 77 S.Ct. 912, 915, 1 L.Ed.2d 972 (1957)).

In their briefs on Union's motion, the parties pretty much repeat the debate just described in dealing with National's motion to vacate. Essentially all of the conclusions reached in this opinion's discussion of National's motion apply to Union's motion as well.[5] In short, Arbitrator Epstein's Award is valid. Therefore Union is entitled to judicial enforcement as a matter of law. Only the scope of relief remains to be considered.

In that respect Arbitrator Epstein ordered that Barnett (Award at 30):

> be promptly restored to his previous position with restoration of full seniority and with restoration of pension rights and contributions but there will be no compensation for any loss of back pay.

Those remedies are clearly appropriate and are hereby made part of this Court's order of enforcement. However, Union also seeks two additional remedies that require discussion: back pay and its attorneys' fees and costs.

■ *1. Back pay.* Arbitrator Epstein denied any award of back pay because he found that National had acted in the good-faith belief that Barnett's vision fell short of DOT requirements (Award at 28). Though Union accepts that ruling, it asks for back pay from July 9, 1991 forward because that is the date as of which Barnett should have been reinstated. But Union offers no authority (nor has this Court unearthed any in its own brief research) for the proposition that a district court may so enlarge an arbitrator's award. Nor does

---

5. Only one material fact can be said to be in dispute on Union's motion: the extent of Arbitrator Epstein's reliance on Dr. Levine. When this Court reverses the inference-drawing process by applying the pro-National inferences that are required on Union's Rule 56 motion, the record looks murky enough so that a remand might be required to obtain an explana-

tion from Arbitrator Epstein as to whether he evaluated Dr. Levine's report or merely forwarded it to the parties. But the already-explained decision that National waived the delegation argument, which is applicable on Union's Rule 56 motion just as on National's, makes such a remand unnecessary.

Union argue, as it might perhaps have contended, that a grant of back pay post-dating the Award is implicit in Arbitrator Epstein's order that Barnett "be promptly restored to his previous position" (*id.* at 30)—a remedy that would perform somewhat the same function as post-judgment interest (that is, compensating for the delay sustained by the prevailing party in obtaining the benefit of his, her or its entitlement) if the Award were to be viewed as the arbitral equivalent of a judgment.

Enforcement actions, as noted, are in the nature of actions for specific performance. This Court will not take it upon itself—at least in the absence of cited authority—to add what would amount to compensatory damages to the courts' remedial arsenal in such actions. If Union seriously expected an award of post-Award back pay (even in the nature of adjusting for the delay in enforcement of a proper Award), it should have cited some cases. This Court of course expresses no opinion as to whether the arbitration agreement, or arbitration law generally, would permit Union to pursue such an implicit-relief theory of damages by returning to Arbitrator Epstein.

■ *2. Attorneys' fees.* Attorneys' fees may be awarded when the position of the party resisting enforcement "has no merit or is 'frivolous,' that is, [maintained] in bad faith to harass rather than to win" (*Chrysler Motors,* 959 F.2d at 689). Does National fail that test?

■ In one sense National pursued this litigation with the best of motives: It wanted to keep a driver with allegedly bad eyesight off the road. But it is the likelihood of success, and not just salutary motives, that makes a case non-frivolous for fee award purposes. In that sense National has a much less attractive position, for it is charitable indeed to describe its legal arguments as non-starters. Perhaps National's lawyers, not grasping the substantive law, mistakenly advised their client that the case was winnable. Any number of colorful labels might apply to such behavior, but "bad faith" is not among them. One such label (though this Court renders no ruling on the subject) would be to hold such conduct a violation of Rule 11, which requires counsel to make a reasonable pre-filing inquiry into the state of the law and also eliminates the "pure heart, empty head" defense just described in favor of an objective standard. But Union has not brought a Rule 11 motion—and although there may be occasions when it is in order for a court to impose Rule 11 sanctions of its own accord (and this Court has sometimes done just that), this is not on its face the case to do so.

National's counsel also could have advised it that the case was a sure loser, but nonetheless agreed to pursue the matter in the hope (for themselves) of some fees and the hope (for the client) of delaying the inevitable rehiring of Barnett—or in the hope of preventing his rehiring altogether by entangling Union in litigation so costly that it would choose to drop the matter. Any such scenario, if true, would surely violate not only the bad-faith test of *Chrysler Motors* but also the less demanding objective test of Rule 11.

National has not shown any facts to support any such sinister theory. Of course, if facts of that nature existed they might well prove undiscoverable in light of the attorney-client privilege. For that reason among others, *subjective* bad faith (like other questions of someone's intent) may most often be inferred from the *objective* facts—in this case, the frivolousness of a litigant's legal theories.

This Court will not draw such an inference. National's arguments, while unpersuasive, were just colorable enough to withstand the charge of bad faith. That conclusion rests primarily on National's delegation argument. As n. 4 reflects, this Court has no information that National's current lawyers tendered that argument with knowledge of the original counsel's effective total waiver of the point by counsel's letter to Dr. Levine. Moreover, the current lawyers' contention that the full scope of Arbitrator Epstein's claimed error did not become apparent until July 1991 does not appear to rise—or fall—to the malum fides level either. Union's request for attorneys' fees is therefore denied.

*Conclusion*

There is no issue of material fact, and Union is entitled to a judgment as a matter of law. National's motion for summary judgment is denied, and its action to vacate the Award is dismissed. Union's motion for confirmation and enforcement of the Award as made is granted. Its further requests for back pay and for attorneys' fees are denied.

## ON MOTION TO AMEND

This Court's April 20, 1992 memorandum opinion and order (the "Opinion," at 787 [1]) granted summary judgment in favor of International Brotherhood of Teamsters Local No. 731 ("Union") and rejected summary judgment in favor of National Wrecking Company ("National"). In sum, the Opinion ruled that the arbitration award issued by Arbitrator Albert Epstein (the "Award") requiring National to reinstate truck driver Joseph Barnett ("Barnett") should be upheld. Union has now moved:

1. to amend the judgment by awarding back pay to Barnett from the July 9, 1991 date of the Award to the date of his reinstatement by National; and

2. to grant sanctions against National.

### *Amendment of the Judgment or Implementation of the Award?*

 This Court cannot, of course, amend the Award as such—its role is rather one of enforcing or denying enforcement of the Award. This Court can however amend its own judgment as it has been embodied in the Opinion—but only within the limits that the law allows.

In this instance Arbitrator Epstein ordered that Barnett be reinstated, although he did not also order pre-Award backpay because he viewed National's dispute on the merits as having been bona fide. Without question Arbitrator Epstein expected (entirely justifiably) that the reinstatement would be implemented promptly—after all, National had expressly participated and cooperated in the procedure under which the

determination of a neutral ophthalmologist designated by Arbitrator Epstein would resolve the issue of Barnett's medical qualification to work as a driver.

National did not comply. Exactly what price it should pay for its noncompliance (other than the litigation-related question of whether sanctions should be imposed against it, as to which Arbitrator Epstein obviously plays no appropriate role) is itself properly a matter for the arbitrator. It involves implementation of the Award, and Arbitrator Epstein had expressly retained jurisdiction to do that. It is for him to decide:

1. whether the nature of the Award inherently implies that National's failure to carry out its duty of reinstatement should require it to pay Barnett from July 9, 1991 forward (less, if appropriate, any earnings that Barnett may have derived from other employment during that post-Award period);

2. whether the delay in National's payment of that post-July 9, 1991 income should also require it to compensate Barnett for such delay—perhaps by the payment of compound interest at the prime rate, calculated from what would have been the respective dates of payment if he had been reinstated, as our Court of Appeals teaches is the normal (if not indeed the universal) rule in federal-question cases (see, e.g., *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 436–37 (7th Cir.1989), reconfirmed in *Rivera v. Benefit Trust Life Ins. Co.*, 921 F.2d 692, 696 (7th Cir.1991)), or perhaps by some other appropriate measure; and

3. whether the added and needless burden that is being thrust on Union by its having to return to the arbitration table should also require National to bear Union's attorneys' fees and other expenses incurred in that process.

This Court of course has its own views on each of those subjects. But the appropriate division of function that exists be-

---

1. For convenience, citations to the Opinion will simply take the form "Opinion at ——" (refer-

ring to the Federal Supplement pagination).

tween arbitrators and courts where parties have contractually committed themselves to the arbitration process surely makes it more seemly—if not actually a matter of jurisdiction as well—for such matters to be left to the arbitrator in the first instance.

One thing should be made plain, however. Arbitrator Epstein has given National more than the benefit of the doubt by his having resolved the original backpay question in its favor in the Award. This Court's view is that National's pursuit of this litigation, rather than its having promptly acceded to the method of nonjudicial dispute resolution in which it had voluntarily participated without cavil, has forfeited any further entitlement to such consideration— a subject dealt with in the next section of this opinion. In that respect this Court shares our Court of Appeals' lack of patience with those who choose voluntary alternative dispute resolution, only to frustrate that choice by the unjustifiable invocation of judicial review (see, e.g.—typical of a whole series of cases to that effect— *Dreis & Krump Mfg. Co. v. International Ass'n of Machinists & Aerospace Workers*, 802 F.2d 247, 254–56 (7th Cir.1986)). National should be forewarned that if that pattern were to be repeated next time around, matters would go hard with it.[2]

### *Award of Sanctions*

■ This Court concluded the Opinion by declining to tax National's new lawyers (that is, the counsel who represent National in this litigation, though they did not handle the original arbitration) with Union's attorneys' fees (Opinion at 794–95). In doing so the Opinion gave the current counsel the substantial benefit of the doubt, on the ground that what this Court viewed as the unequivocal waiver of the issue that counsel urged on it during the cross-motions for summary judgment had taken place during the 1991 arbitration under the aegis of National's former lawyers (*id.;* and see *id.* at 792 n. 4). Now Union has moved for

sanctions and an award of fees under Fed. R.Civ.P. ("Rule") 11.

Both sides' submissions on this post-Opinion motion demonstrate the problems that are sometimes created by a court's addressing of issues without full briefing by the parties. Union points out quite accurately—referring to a fact that was not focused on by this Court in the Opinion— that (Union's Motion at 2):

> 5. This Court should now grant Rule 11 sanctions on the Union's motion since, at all times since the Union's filing of its answer and counterclaim to enforce the award, National's counsel was fully aware of the original counsel's waiver of its delegation argument, yet it persisted with the delegation argument as its primary reason to deny enforcement of the award.

Union's Counterclaim ¶ 18 had expressly referred to the prior lawyers' letter:

> By letter dated February 27, 1991, National's attorney wrote to the neutral ophthalmologist as follows:
>
> > It is our understanding that you will issue a final determination as to Mr. Barnett's qualifications under the U.S. Department of Transportation's vision requirements for drivers.
>
> In the letter, National's attorney also submitted to the ophthalmologist the applicable United States Department of Transportation regulations, all prior medical reports submitted to the Arbitrator, and a copy of the Arbitrator's January 10, 1991 award.

Hence, says Union, National's persistence in continuing to assert its argument based on the claimed impropriety of Arbitrator Epstein's "delegation" to · the neutral ophthalmologist should at least make National responsible for all the lawyers' fees that Union had to incur after that Counterclaim was filed.

National's responsive memorandum has to be viewed as disingenuous. It claims

---

**2.** This should not be misunderstood as foreclosing any legitimate exercise of procedural rights on National's part. But given its performance to this point, together with its strong current resistance to this Court's decision of the

remaining open issues on the ground that they are for the arbitrator to resolve, the question of what is "legitimate" would be examined through a high-powered lens if National were to seek review of the arbitrator's next set of rulings.

that National did not realize the significance of the arbitrator's designation of the independent medical examiner until *after* National's then lawyers had transmitted the February 27, 1991 letter agreeing to and cooperating with that procedure. National Mem. 4 first points to Arbitrator Epstein's statement in Award at 30 that "an award *will* issue" (National's emphasis), then supplies the following emphasis to the Award at 29–30:

2. The *determination of the visual qualification of the Grievant under the Department of Transportation regulations* is referred back to the parties for arrangement of a redetermination by a neutral qualified ophthalmologist.

\* \* \* \* \* \*

4. The ophthalmologist selected shall promptly examine the Grievant and certify to the parties and to the arbitrator if the Grievant is visually qualified under the Department of Transportation regulations. If found to be so qualified, the Grievant shall then be promptly restored to his previous position with restoration of full seniority and with restoration of pension rights and contributions but there will be no compensation for any loss of back pay. If the Grievant is found not to be so qualified, the grievance will be dismissed.

National has obviously donned self-imposed blinders: It stresses the underscored portion of the first quoted sentence while simultaneously paying no attention at all to (let alone its not emphasizing) the full disclosure that was represented by the rest of the quotation. Perhaps National fails (or more likely refuses) to understand even now that there was no question from the minute the Award was entered that (as Opinion at 790 said) the "neutral expert['s] findings would control the outcome of the case." National certainly cannot claim in good faith that it was not on notice as of the Award date (January 30, 1991) that

such was Arbitrator Epstein's intention—and therefore it unquestionably waived any objection to that procedure when, four weeks later, its counsel sent the neutral ophthalmologist all of the materials and information needed for his decision in a letter that began:

We have been informed of your appointment by Arbitrator Albert A. Epstein to examine Mr. Joseph Barnett. It is our understanding that you will issue a final determination as to Mr. Barnett's qualifications under the U.S. Department of Transportation's vision requirements for drivers.

That express reference to "a *final* determination as to Mr. Barnett's qualifications" meshes perfectly with the Award's express statements that Barnett's restoration to his job or the dismissal of his grievance would be controlled entirely by whether he was or was not "found to be so qualified." There is no question as to National's total acquiescence and cooperation in that process, or as to its knowledge from the beginning of the arbitrator's "delegation" to the neutral ophthalmologist that National belatedly sought to complain about in this lawsuit.

Thus National's arguments today are as empty as they were when they were dispatched in the Opinion at 791–92. This Court need not find the presence of subjective bad faith on National's part to deal with the question of sanctions under Rule 11 now that the Union has posed it. At least from and after the date on which Union filed its Answer and Counterclaim by which it put National's current lawyers on notice of National's waiver through predecessor counsel,[3] National's continued pursuit of its claim by the filing of any further court documents for that purpose in this litigation contravened Rule 11. That violation requires the imposition of an "appropriate sanction." Under all the circumstances this Court finds that to be the

---

3. By choosing that filing as the watershed date, this Court probably gives National and its present counsel more credit than they merit. After all, Rule 11 demands that a reasonable factual as well as legal investigation must be made before any legal document is filed. Any failure on counsel's part (and, of course, on National's part) to be aware of the February 27 letter before this lawsuit was brought (if that was in fact the case) would surely suggest the total inadequacy of any prefiling inquiry.

partial fee-shifting that is represented by Union's attorneys' fees incurred after that time—a ruling wholly in accordance with the teaching of such arbitration-review cases as those cited in *Continental Can Co. v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund,* 921 F.2d 126, 128 (7th Cir.1990) for this proposition:

> We have remarked before that awards of attorneys' fees are readily available when one side refuses to accept an arbitrator's award and loses.

Accordingly National and whichever of its current counsel were involved in such post-Counterclaim filings (see *Pavelic & Leflore v. Marvel Entertainment Group,* 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989)) are jointly and severally ordered to pay Union's reasonable attorneys' fees incurred after National's first post-Counterclaim filing. This Court sets a status hearing to be held at 9 a.m. June 4, 1992, so that the parties may confer in the interim and then advise at the time of that hearing whether and to what extent an evidentiary hearing or evidentiary determination is required to quantify the award of sanctions.

### Conclusion

This Court remands all issues bearing upon further implementation of the Award beyond immediate reinstatement of Barnett to Arbitrator Epstein, pursuant to his retention of jurisdiction in that respect. Lest there be any room for doubt, however, this Court expressly determines that its Opinion and judgment enforcing the Award—the sole issue posed by judicial review of the Award as such—is the final order in this litigation. Once again National is ordered to reinstate Barnett *immediately,* without awaiting the resolution of the collateral questions that are the subject of the remand. And finally, on the issue of Rule 11 sanctions, the matter is set for the June 4 status hearing for the purposes stated earlier.